## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **JANE DOE, a North Dakota resident,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **LeTOURNEAU UNIVERSITY, a Texas** | § | |
| **resident and BENJAMIN MURPHY, a** | § | |
| **Texas resident** | § | **JURY DEMAND** |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Jane Doe, by her attorneys Hossley & Embry, LLP and Nesenoff & Miltenberg, LLP as and for their Complaint against Defendants LeTourneau University ("LETU" or "the University") and Benjamin Murphy ("Murphy") alleges as follows:

## INTRODUCTION

1. This case arises out of the *on-campus sexual assault and date rape* of Plaintiff by Defendant Murphy while both were students at LeTourneau, and the University's deliberate indifference to the same, in complete violation of its Policies and state law.

2. Between October 31 and November 17, 2021, in the Fall semester of Plaintiff's Senior year, Plaintiff's then-boyfriend, fellow LETU student Murphy, repeatedly drugged and sexually violated her on LETU campus.

3. At the June 2022 Title IX hearing, against the greater weight of evidence, LETU found Murphy not responsible for sexual misconduct and in breach of numerous LETU Policies.

4. LETU fraudulently pressured and unduly influenced the faculty jury panel members in to voting to acquit Murphy.

## PARTIES

5. Plaintiff Jane Doe is an adult resident of the State of North Dakota, which is her true, fixed, and permanent home. During the events relevant to this action, she was enrolled as student at LETU studying biomedical engineering. She graduated in 2022 with a degree in that field.

6. Defendant LETU is a private, interdenominational evangelical Christian university located at 2100 S. Mobberly Ave. Longview, TX 75602.

7. According to its student handbook, LETU holds itself out as "a comprehensive institution of Christian higher education where educators engage learners to nurture Christian virtue, to develop competency and ingenuity in their professional fields, to integrate faith and work, and to serve the local and global community."[1] It claims that Christ "guides every aspect of our lives."[2]

7. The University also describes itself as "an educational community that: "Fosters an engaging environment conducive to teaching and learning, cultivates Christian virtue, and Contributes to the enrichment and service of the local and global community."[3]

8. The University imposes and claims to abide by the following "Biblical and Community Standards":

> Believing the Word of God to be of supreme and final authority in faith and life, the absolutes of the Scriptures speak directly to certain standards. These Biblical

---

[1] https://www.manula.com/manuals/letourneau-university/letourneau-university-student-handbook/1/en/topic/mission-vision-and-goals

[2] https://www.manula.com/manuals/letourneau-university/letourneau-university-student-handbook/1/en/topic/letters-from-university-leaders

[3] https://www.manula.com/manuals/letourneau-university/letourneau-university-student-handbook/1/en/topic/mission-vision-and-goals

standards lay the foundation for our code of conduct. In addition to standards what is explicitly stated in the Bible, we have incorporated other standards into our code of conduct for the purposes of safety, respect for property and others, successful university operations, and developing and maintaining the type of community we desire to have on our campus. In order to provide a structure that allows for social order and cohesiveness – while protecting individual rights – certain common courtesy guidelines are necessary. These include appropriate procedures, guidelines, and regulations concerning social relationships and personal behavioral choices. These are not to be interpreted as standards of spirituality, but as standards of one's ability to function as an individual within this particular community of university students, faculty, and staff.[4]

9. According to the LETU student handbook,

You are considered a LeTourneau student from the moment you enroll at the institution until the moment you graduate, transfer, or withdraw. It is the students' responsibility to be aware of these expectations and conduct themselves accordingly as members of the LeTourneau community. Adherence to the handbook is expected of LeTourneau University students wherever they may be, for the duration of their enrollment at the University (including semester and holiday breaks . . . [And]

LeTourneau University does not discriminate on the basis of race, color, national or ethnic origin, _sex_, disability, veteran status or age in the administration of any of its educational programs, admissions policies, scholarship and loan programs, athletic and other school-administered programs.[5]

10. Defendant Benjamin Murphy ("Murphy") is an adult resident of the State of Texas. At all times relevant to this action, he also was enrolled as a student at the University and lived on-campus. Upon information and belief, Murphy graduated in 2022.

---

[4] https://www.manula.com/manuals/letourneau-university/letourneau-university-student-handbook/1/en/topic/biblical-and-community-standards

[5] https://www.manula.com/manuals/letourneau-university/letourneau-university-student-handbook/1/en/topic/about-the-student-handbook

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. §1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.

12. The Court has personal jurisdiction over Defendants LeTourenau and Murphy as they are both domiciled in the State of Texas.

13. Venue is proper in the Eastern District of Texas to 28 U.S.C. §1391(b)(1) as Defendant LETU is located within that District and all operative events took place within this District. Further, Venue is proper and convenient in this Division of the Eastern District of Texas because the subject incident occurred in Gregg County, Texas, within this Division.

## FACTUAL ALLEGATIONS

14. Plaintiff was introduced to Defendant Murphy in the fall of 2021, her senior year at LETU, through mutual friends.

15. Plaintiff and Murphy briefly dated between early October and mid-November, 2021.

16. Murphy asked Plaintiff out on a date shortly thereafter and things progressed quickly. Initially, Plaintiff and Murphy got along well, finding agreement on social and political issues. However, they differed on the propriety of premarital sex and physical intimacy.

17. The parties had their first date on October 31, 2021, and except for a few nights, she spent every evening with Murphy at his dorm room.

18. Plaintiff felt her Christian faith called her to save sex for marriage, and to abstain from drugs, alcohol, and profanity.

19. Defendant Murphy, conversely, claimed to be a Christian but was not opposed to premarital sexual relations, and frequently consumed drugs and alcohol.

20. At the time, Plaintiff was clear to Murphy that she willing to overlook these differences if Murphy respected her boundaries such as not drinking, taking drugs, or having sex. She specifically made it clear to Murphy that she was not interested in any sexual activities beyond kissing.

21. Murphy claimed he understood. He had only recently adopted Christianity, and, to Plaintiff, he came off as a misguided person that needed help being led to Christian values.

22. After they began dating, Plaintiff invited Murphy to her church and they began attending together. This left her hopeful that she could lead him in the right direction and that the church would bring him the same healing that it had brought her.

23. Although she had had previous boyfriends, Plaintiff had not been physically intimate in any previous relationships.

24. Plaintiff did not have any real sex education before college, knowing nothing beyond what she had learned in her human anatomy and physiology course at LETU.

25. While Plaintiff was committed to saving herself for marriage, she thought kissing and cuddling were okay and did so consensually with Murphy.

26. However, Murphy would push her boundaries. For example, he would talk constantly about sex, encouraging her to attend his sexuality class and even giving her a book about sex.

27. Another time, while they were kissing, Murphy asked Plaintiff if he could "eat her out". Plaintiff, unsure of what that meant, responded that she would have to get back to him. When she learned what Murphy was referring to, she was appalled and disgusted, as she had already expressed that she did not want to do any such thing before marriage.

28. Over time, Murphy's behavior became darker and more concerning. For example, he sent Plaintiff a Tik Tok video of a man talking about getting his girlfriend into bed and then beating her in the head.

29. Subsequently, there were several instances in which Murphy would punch the area around Plaintiff's head, leading her to think "He wants to hit me." Murphy later told investigators that this was merely a "joke." However, Plaintiff did not find this funny; she was terrified. However, she was enamored with Murphy and simply hoped this "joke" would pass.

30. Further, Murphy and some of the couple's mutual friends pressured Plaintiff to experiment with Bondage, Dominance, Submission and Masochism ("BDSM"), a sexual behavior premised on deriving pleasure from causing pain.

31. Murphy introduced BDSM slowly, starting with light choking during kissing – which Plaintiff felt was okay. However, it gradually progressed to heavier, more painful choking.

32. All their time together was spent in Murphy's LETU dorm room. Plaintiff and Murphy would stay up late cuddling or making out.

33. In these moments, Murphy would often get up and get Plaintiff water. However, it was never water from the sink; instead, Murphy would leave the room and be gone for a while, returning with ice-cold water. Strangely, Murphy would never let Plaintiff her get her own water, always protesting or dissuading her when she tried to do so.

34. Within an hour of drinking the water, Plaintiff would begin to feel loopy and dizzy. She would begin slurring her speech and would barely be able to hold herself up.

35. At the time, Plaintiff naïvely wondered if she was simply feeling 'love drunk', as if this was what true love felt like.

36. While she was in this state, Murphy would get on top of Plaintiff and roughly pin her down, sometimes covering her mouth so she couldn't speak, and grinding his erect penis onto her genital area. Murphy would do this so hard that it hurt.

37. It wasn't until after their relationship ended that she realized Ben had drugged her water with Rohypnol or gamma-hydroxybutryic acid (GHB), both common date rape drugs.

38. This was not the Murphy's first instance of abuse against Plaintiff. He would often resort to verbal manipulation or coercion to get Plaintiff to relax her physical boundaries. For example, while they would be kissing, Murphy would repeatedly ask Plaintiff to grab his penis, despite Plaintiff telling him that she was not comfortable doing so. Once, Murphy grabbed Plaintiff's hand and placed it on his erect penis without her consent, encouraging Plaintiff to move her hand up and down over it.

39. Due to her sexual inexperience, Plaintiff did not realize she was being tricked into performing a sexual act on Murphy without her consent.

40. Their relationship ended shortly thereafter, with Murphy, who was about to graduate, telling Plaintiff that he did not want to have a long-distance relationship with her, and that they should either date casually or just break up.

41.  Plaintiff felt heartbroken and used. Murphy for his part, showed no emotion as she cried on his bed. Instead, he pulled her towards him and kissed her. But she was too confused and baffled to stop him. Murphy was especially rough during this, which Plaintiff did not consent to.

42. With the help of her friends, Plaintiff eventually realized that Murphy had been repeatedly drugging and assaulting her. She then told Murphy she could not see him anymore.

43. Plaintiff was terrified of how Murphy would retaliate if she reported him to authorities. Indeed, Murphy once told her that he was going to kill someone because he was so angry.

44. Nevertheless, Plaintiff reported Murphy to her Resident Assistant, who told her to go to the hospital immediately to get tested. However, it had been at least a day since Murphy had last given her the drugged water, and the date rape tests came back negative.

45. Upon information and belief, GHB can be detected in a person's urine for up to 12 hours after last use, in blood for up to 8 hours, and in saliva for only 6 hours.

46. Plaintiff filed a police report that night. However, the police told her it was impossible to do anything unless she had been raped, and even that would be hard to prove.

47. She also reported Murphy to LETU authorities for drug and alcohol possession. Campus police raided his room and found a variety drug paraphernalia, sex toys, lubes, and 30 condoms.

48. Murphy's actions violated several of LETU's policies.

49. Its Specific Behavioral Policies expressly prohibits, *inter alia*:

> The possession, manufacturing, use, sale, or distribution of tobacco, nicotine, alcoholic beverages, or **illicit drugs**. The prohibition against the use or possession of these items is a matter that the University takes seriously. Each has been widely recognized as a source of serious health and social problems. Their prohibition reflects LeTourneau University's tradition in keeping with the teaching of Scripture that we are to view our bodies as the temple of the Holy Spirit and thus treat them accordingly. Abstinence from these items will foster discipline and self-control, and the University will be drawn closer together as a community if all of its members avoid their use.[6]

50. The same Policy also prohibits:

> **Abuse**, harassment, bullying, or **assault, including physical abuse**, **verbal abuse**, written abuse (online or in print), threats, stalking, intimidation, humiliation, pestering, coercion, or other conduct that threatens or endangers the physical, psychological, or emotional health – or the belongings – of any person. . .[7]

---

[6] https://www.manula.com/manuals/letourneau-university/letourneau-university-student-handbook/1/en/topic/specific-behavioral-guidelines. (Emphasis added.)

[7] *Id.* (Emphasis added.)

[And]

Any other activity that is ***in violation of the laws of the land*** (the local community, the state, and the federal government).

51. Further, LETU's Drug and Alcohol Prevention Policy states:

The LETU campus, all other University-owned or leased property, and all University-sponsored activities – on or off campus – are alcohol, drug, and tobacco free. The use, possession, or distribution of alcoholic beverages, illicit drugs, tobacco, or other controlled substances (including the misuse of prescribed medications or use of any substance with the intent of becoming impaired/intoxicated) on the LETU campus is prohibited and violates this policy as well as the University's standard of conduct.[8]

[And]

When violations of law or policy come to the attention of LETU officials, students may be referred for prosecution and University sanctions *will* be imposed.

51. Additionally:

Any student who encourages another to consume alcoholic beverages or any substance as a means to induce that individual to engage in behavior that would otherwise be against that person's will is subject to dismissal.

[And]

Any student ***who sexually assaults another person who is intoxicated or impaired is subject to immediate dismissal***.[9]

52. The University's Anti-Harassment Policy states:

LeTourneau University is committed to vigorously enforcing the policy against harassment including, but not limited to, ***sexual harassment, sexual violence***, coercion, ***intimidation***, and exploitation. Other examples of harassment include unwelcome slurs, jokes, comments, graphic or physical conduct, or other intimidating, hostile, or offensive communication relating to an individual's race, religion, sex, age, national origin, or disability.

---

[8] https://www.manula.com/manuals/letourneau-university/letourneau-university-student-handbook/1/en/topic/drug-and-alcohol-prevention-policy

[9] *Id.* (Emphasis added).

53. Despite this, Murphy was not kicked out of LETU. And, upon information and belief, he was not disciplined at all.[10]

## LETU TITLE IX PROCESS

### a. LETU Title IX Policy and events leading up to hearing

54. Due to Murphy's abuse, Plaintiff was diagnosed with PTSD over her winter break and put on medications for severe depression and anxiety. She also suffered from suicidal thoughts. However, she continued praying and began therapy to help cope with the pain.

55. In December 2021 Plaintiff filed a Title IX complaint with LETU, alleging that she was subject to sexual harassment, and that "the University failed to provide [her] with disability-related accommodations." Plaintiff's complaint brought the following charges against Murphy: 1) Title IX sexual harassment, 2) non-title IX sexual harassment, 3) sexual assault, and 4) dating violence.

56. In the Title IX section of its webpage, LETU describes itself as

> A Christ-centered community, committed to providing and maintaining a learning and working environment that is free from sexual, racial, and other forms of harassment and misconduct. LeTourneau University believes its students, faculty members, employees, and campus guests should experience an environment free from sexual misconduct and from harassment based on an individual's race, sex, age, national origin, disability, military service, or any other legally protected status.[11]

57. It goes on to represent that "In compliance with federal and state laws, it is the policy of LeTourneau University to prohibit unlawful harassment and sexual misconduct by any person and in any form."[12]

---

[10] https://www.manula.com/manuals/letourneau-university/letourneau-university-student-handbook/1/en/topic/student-conduct-process
[11] https://www.letu.edu/student-life/title-ix.html#ContentBlock-1-1
[12] *Id.*

58. And that "LeTourneau University will investigate all complaints of harassment or sexual misconduct, formal or informal, verbal or written, and take appropriate action or discipline against any person who is found to have violated this policy."[13]

59. LETU's Sexual Assault Policy ("the Policy") repeats these representations and further represents:

> a. LeTourneau University is a Christ-centered academic community, committed to providing and maintaining a learning and working environment that is free from sexual and other forms of harassment and misconduct and that is reflective of our Christian faith and characterized by civility and mutual respect.[14]

> b. Sexual Harassment or Sexual Misconduct, in any form, does not reflect the high standards and ideals of our community and will not be tolerated at LeTourneau University.

> c. Sex discrimination is prohibited by Title IX of the Education Amendments of 1972, a federal law that provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." The University is required by Title IX and its regulations not to engage in sex discrimination in its education program or activity, including admissions and employment. Sex discrimination is conduct based upon an individual's sex that excludes an individual from participation in, denies the individual the benefits of, or treats the individual differently in an education program or activity. Sexual Harassment is a form of sex discrimination.

> d. The University will not tolerate Sexual Misconduct in any form. The University will ***promptly and equitably*** respond to all reports of Sexual Misconduct in order to take steps to eliminate the misconduct, prevent its recurrence, and address its effects on any individual and the community.[15]

> e. This Policy applies to all University community members, including students, employees, faculty, staff, temporary employees, trustees, [etc.] volunteers, vendors, independent contractors, visitors, guests, applicants for admission or employment, and any individuals regularly or temporarily employed, studying, living, visiting, conducting business or having any official capacity with the University or on University property. This Policy may also apply to individuals who interact with University community members under certain circumstances. All University

---

[13] *Id.*
[14] https://www.letu.edu/student-life/files/Harassment_and_Sexual_Misconduct.pdf
[15] *Id.* p.2

community members are required to follow University policies, and all community members are protected by this Policy.

f. This Policy applies to Sexual Misconduct that is committed by or against a University community member that:

> • occurs on campus or University property, such as a residence hall, classroom, or on-campus event;

g. Under the heading "Prohibited Conduct", the University prohibits the following forms of Sexual Misconduct: Title IX Sexual Harassment, Non-Title IX Sexual Harassment, Sexual Exploitation, Sexual Assault, Domestic Violence, Dating Violence, and Stalking.

h. The Policy defines Title IX Sexual Harassment as "unwelcome conduct on the basis of sex determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity…."[16]

The Policy defines Non-Title IX Sexual Harassment as "Unwelcome, sex-based verbal or physical conduct, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, when… such conduct has the purpose or effect of unreasonably interfering with an individual's employment or education, or of creating an intimidating, hostile, or offensive employment or educational environment."[17]

h. The Policy defines Sexual Assault as "any actual or attempted sexual contact, including contact with any object, with another person without that person's consent. As used in this Policy, sexual contact includes: intentional contact by the accused with the victim's private body parts (genital area, anus, groin, inner thigh, buttocks, or breasts), whether clothed or unclothed; touching another with any of these private body parts (genital area, anus, groin, inner thigh, buttocks, or breasts), whether clothed or unclothed; coerced touching by the victim of another's private body parts (genital area, anus, groin, inner thigh, buttocks, or breasts), whether clothed or unclothed; or forcing another to touch oneself with or on any of these body parts.

i. It defines Incapacitation as the physical and/or mental inability to understand the fact, nature, or extent of the sexual situation. Incapacitation may result from mental or physical disability, sleep, unconsciousness, involuntary physical restraint, or from the influence of drugs or alcohol. . . . Incapacitation is determined based on the facts and circumstances of the particular situation, looking at whether the individual was able to understand the fact, nature, or extent of the sexual situation; whether the individual was able to communicate decisions regarding consent,

---

[16] *Id.* p.6
[17] *Id.* p.8

nonconsent, or the withdrawal of consent; and whether such condition was known or reasonably known to the accused or a reasonable sober person in the accused's position. . . .[18]

j. The Policy also prohibits domestic and dating violence. Dating Violence is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim. Dating Violence includes, but is not limited to, sexual or physical abuse or violence, such as Sexual Assault, physical harm, bodily injury, or criminal assault, or the threat of such abuse or violence.[19]

k. As well as a Stalking: Stalking is engaging in a course of conduct directed at a specific person that would cause a reasonable person (1) to fear for her or his safety or the safety of others, or (2) to suffer substantial emotional distress.[20]

l. Reporting Sexual Misconduct: The University encourages individuals who have experienced Sexual Misconduct or who know about an incident of Sexual Misconduct to report the incident to the University, so that affected individuals may receive the support they need and so the University may respond appropriately. In addition, the University encourages individuals who have experienced criminal Sexual Misconduct to report the incident to law enforcement.[21]

60. The Policy continues with more specific promises:

a. Upon receiving a report of Sexual Misconduct, the Title IX Coordinator will promptly contact the complainant to discuss the availability of supportive measures with or without the filing of a formal complaint and to explain the process of filing a formal complaint. In addition, when a student or employee reports to the University that they have been a victim of alleged Sexual Assault, Domestic Violence, Dating Violence, or Stalking, regardless of location, the University will provide a written explanation of available rights, options, and procedures.

b. The University will support any person adversely impacted by Sexual Misconduct. Both the University and the community provide a variety of resources to assist and support individuals who have experienced Sexual Misconduct or are affected by allegations of Sexual Misconduct. These resources, both immediate and ongoing, are available to all persons irrespective of their decision to report to the Title IX Coordinator or to law enforcement.[22]

p. When the University receives a formal complaint of a potential Policy violation, the University will *promptly and equitably respond* to the formal complaint in accordance with the provisions and procedures set forth below. The University *will*

---

[18] *Id.* p.10
[19] *Id.* p.11
[20] *Id.* pp.11–12
[21] *Id.* p. 14
[22] *Id.* p.21

*provide a fair and impartial complaint resolution process*. A fair process is one that treats the parties equitably, provides complainant an opportunity to file a formal complaint alleging a violation of this Policy and an opportunity to present evidence of the allegations prior to a decision on responsibility. . . and provides both parties an opportunity to challenge the credibility of the other party and any witnesses prior to a decision on responsibility.[23]

Each complaint resolution process will require an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence. Credibility determinations will not be based on a person's status as a complainant, respondent, or witness. The burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the University and not on the parties.[24]

q. Each Sexual Misconduct complaint resolution process will be conducted by individuals, including Title IX Coordinators, Investigators, Title IX Hearing Panel members/Adjudicators and any person who facilitates an informal resolution process, who do not have a conflict of interest or bias for or against complainants or respondents generally or for or against the individual complainant or respondent.[25]

61. On December 9, 2021, in response to Plaintiff's Title IX complaint LETU instituted a mutual no-contact order between Plaintiff and Murphy.

62. Plaintiff moved apartments to be on the opposite side of campus from Murphy. However, despite the no-contact order, Murphy continued to harass her on campus on at least two occasions.

63. The first involved in him honking at her while her car was pulling up to a stop sign. Plaintiff, was in a car with her father, while Murphy was in his own vehicle with several other persons. Plaintiff saw Murphy and several acquaintances waiting for her and her father to drive beside them. They then started honking, causing Plaintiff to go into a panic attack.

---

[23] *Id.* p.23 (Emphasis added).
[24] *Id.* (Emphasis added).
[25] *Id.* p.24

64. Expressing favoritism toward Murphy, Dr. Morgan credited his version of events and accused Plaintiff and her father of lying. She further stated that those in the car with Murphy said that it did not happen and that even if it had, it did not constitute harassment.

65. Plaintiff and her father reported this incident to Dr. Kristy Morgan, the LETU Title IX Director and Vice President for Student Affairs. However, Dr. Morgan did not believe Plaintiff or her father, adding that even if it happened it did not count as harassment.

66. The second instance occurred in early 2022 and involved Plaintiff's on-campus apartment being broken into. Her roommate called saying she saw the door hanging open. Plaintiff's apartment door did not swing open easily, and they would routinely lock the door before leaving.  It was highly unlikely for either of them to leave the door unlocked. Plaintiff left class, rushed home and saw Murphy driving away from her apartment.  Murphy had no classes on that side of campus and would have had to take the long route from his dorm room, which would not make any sense unless he had stopped at Plaintiff's apartment.

67. Plaintiff also reported this incident to Dr. Morgan and to LETU campus police. Dr. Morgan responded that Murphy could drive wherever he pleases on campus. Campus police came to Plaintiff's apartment, briefly looked around, and laughed at her. To date, no action has been taken on her police report,

68. Never taken seriously by LETU and fearing for her safety on campus, Plaintiff returned home for several months, taking classes online.

69. However, Plaintiff eventually returned to campus as she was team lead for her senior design engineering project, for which her team needed her in person. However, the specter of Murphy's abuse and LETU's indifference cast an omnipresent shadow on her educational experience – one that she was paying for.

*b. LETU Title IX investigation and hearing*

70. On December 22, 2021, LETU issued its Notice of Allegations based on Plaintiff's complaint, alleging the following policy violations: Title IX hostile environment harassment, non-Title IX sexual harassment, sexual assault, dating violence, and domestic violence.

71. On the same day, Murphy supplied his written statement in opposition to Plaintiff's complaint.

72. The University's investigator conducted a fact-gathering investigation, which involved interviewing the parties and witnesses.

73. Both Plaintiff and Murphy participated in the investigation and were interviewed, beginning with Plaintiff on January 18, 2022 and Murphy on March 18, 2022.  Both were represented by attorney advisors for their interviews.

74 The investigator also interviewed non-party witnesses on February 2 and April 1, 2022.

75. LETU's Title IX investigation progressed slowly. This is contrary to LETU's Title IX policy, which held that decision should be reached within 45 days of a report. 180 days after Plaintiff's filing, the Title IX process was not even half complete.[26]

76. However, Plaintiff did not lose hope that justice would be done.  She prayed relentlessly, and hoped that LETU, as a Christian institution, would do the right thing and hold Murphy accountable. She was wrong.

---

[26] "The time frame for the investigation generally is within (i) forty-five (45) calendar days from the assignment of the Investigator or (ii) if, after the date the Investigator is assigned, the parties receive an amended notice of allegations that includes new allegations or new parties, forty-five (45) calendar days from the date of the amended notice of allegations.

In some cases, more time may be required. In cases involving allegations of Title IX Sexual Harassment, the University will strive to complete the initial investigation in this 45-day time frame, but the final investigation report will not be completed until after the review of directly related evidence."

77. The University set April 4, 2022 as the 'close of evidence' day, after which it discontinued its investigation.

78. The parties and their advisors were given copies of the evidence to review in April, 2022. Murphy submitted an Evidence Response Statement on April 28, 2022, with Plaintiff doing the same on May 16, 2022.

79. Both parties received a copy of the investigative report on May 20, 2022. Plaintiff filed a response to the investigative report on May 25, 2022; Murphy did not file a response.

80. Prior to the hearing, Plaintiff learned that her case would be the *first* Title IX hearing ever held at LETU. Title IX has existed since 1972. This means that over a period of 50 years, either there had been no sexual assaults at LeTourneau or Plaintiff was the first LETU survivor brave enough to come forward. Or worse, previous survivors came forward and were disregarded or suppressed.

81. On June 1, 2022, approximately *seven months* after Plaintiff filed her complaint, LETU finally held the Title IX hearing. By this time, both Plaintiff and Murphy had graduated.

82. The hearing took place over Zoom. The night before the hearing, Plaintiff learned that the entire hearing had to be completed in *60 minutes*. This was the first notice LETU gave her of this limitation.

83. This was contrary to LETU's policies and a woefully inadequate amount of time for Plaintiff to present her evidence.

84. The hearing Panel, ostensibly, applied the 'preponderance of the evidence' standard, meaning the University had to establish that it was more likely than not that Murphy committed sexual misconduct.[27]

85. Having intentionally delayed the investigation, LETU wished to expedite the *hearing* as much as possible.

86. It endeavored to drag the Title IX *investigation* out long as possible, ensuring Murphy was allowed to graduate. Subsequently, it afforded Plaintiff only an abbreviated hearing to help ensure Murphy was not found responsible.

87. Upon information and belief, had Murphy been found responsible *prior to graduating*, he would not have received his LETU degree.

88. And had LETU conducted the hearing within 180 days of the complaint, as required, it could not have ensured that Murphy first received his diploma.

89. Dr. Morgan originally told Plaintiff the University could revoke Murphy's diploma if he was found responsible after graduation. Weeks later, she backtracked, saying that Murphy would graduate and maintain his diploma regardless of the outcome.

90. on June 30, 2022, the LETU Title IX office issued its written determination, finding Murphy 'not responsible' for violating any LETU policy regarding hostile environment/harassment.

91. Specifically, it found that "there is insufficient evidence to determine that it is more likely than not that Ben engaged in Sexual Assault, Title IX Sexual Harassment, Non-Title IX

---

[27] "The presumption is that the respondent is not responsible for a policy violation. The respondent will be deemed responsible for a policy violation only if the Title IX Hearing Panel concludes that there is sufficient evidence, by a "preponderance of evidence," to support a finding that the respondent engaged in Sexual Misconduct."

Sexual Harassment, Domestic Violence, and/or Dating Violence." And "accordingly, the Panel finds that there is insufficient evidence that a Policy violation by Ben occurred."[28]

92. This was despite Murphy making a crucial mistake during the hearing, saying "When [Doe] realized I was drugging her . . . I mean, thought."

93. Murphy further lied in claiming he had ceased using drugs and alcohol.

94. The hearing "jury" was made up of faculty members, at least one of whom later told Plaintiff that he was pressured into voting "not responsible".

95. The University was thereby able to avoid any negative publicity and the accompanying stain on its reputation as a morally upright, Christian institution.

96. On July 8, 2022, Plaintiff appealed the Title IX finding of 'no responsibility' to the LETU Board. However, on August 24, 2022, the Board denied her appeal.

97. LETU's Sexual Misconduct policy promises the following rights to both parties to a Title IX investigation. Specifically, the parties are entitled to, *inter alia*:

> a. Be treated with dignity and respect,
>
> b. Receive appropriate support from the University,
>
> c. Equitable procedures that provide both parties with a prompt and impartial complaint resolution process,

98. Overall, LETU did not treat Plaintiff with respect and dignity in the Title IX process. Instead, the University, including the University police and Dr. Morgan, treated Plaintiff like a whore and a liar.

99. Plaintiff no longer trusts that people professing to be Christians will be kind and just.

---

[28] However, LETU determined "the mutual no contact directive between Lindsey and Ben will continue in effect until otherwise terminated by LeTourneau."

100. Indeed, this whole affair simply proved that LETU and its decisionmakers only cared about preserving their *image* as a righteous, Christian institution. Beneath that facade, LETU tolerated and protected sexual abuse, showing clear gender-based favoritism to the male party.

101. During the Title IX process, Dr. Morgan and LETU demonstrated favoritism towards Murphy. For instance, Dr. Morgan repeatedly told Plaintiff how bad Ben Murphy felt that the trial and investigation was happening. Dr. Morgan stressed to her that Murphey apparently cried and kept himself in his room for hours because he felt so bad.

102. LETU unfairly limited the duration of the Title IX hearing first to 60 minutes and then, following Plaintiff's request for additional time, to 120 minutes. These limitations critically limited Plaintiff's ability to tell her story and increased the likelihood of Murphy being acquitted.

103. Under the preponderance of evidence standard, the hearing panel needed only be more confident than not that Ben was responsible. There was no reason, apart from bias, for the University to credit Murphy's story over Plaintiff's. Especially as he was <u>caught possessing sex and drug paraphernalia</u> and was caught in several lies at the trial and for all the sex and drug paraphernalia found in his room.

104. Upon information and belief, Murphy never suffered any consequences for possession of these items. This is further evidence of LETU's favoritism.

105. In her appeal, Plaintiff raised the following errors, both leading up to and at the hearing:

    a. Plaintiff never received any response from LETU Title IX Coordinator regarding the issues she raised in her written submission.

    b. LETU never gave Plaintiff the opportunity to submit a written rebuttal statement to Murphy's written submission.

c. Plaintiff was not given any 'notice of clarifications' requested from the investigator by the Title IX coordinator following her review of both parties' written submissions.

d. Nor was she provided access to the adjudication file provided to the hearing panel, which consisted of the investigation report and exhibits, as well as Plaintiff's response to the report.

e. LETU did not provide Plaintiff with details about the hearing until the night before, including that the entire hearing was limited to *60 minutes*. Although, when asked, Dr. Morgan, on the morning of the hearing, increased the time limit to 120 minutes per side.

106. LETU committed further breaches of its policies leading up and during the hearing, including:

a. Unfairly limiting the time Plaintiff and her advisor had to present their version of events at the hearing.

b. There were several instances during the hearing wherein Plaintiff was not allowed to respond to Murphy or his witness' statements.

c. Allowing several different witnesses to testify on Murphy's behalf despite conflicts of interest.

d. Admitting Murphy's testimony as to Plaintiff's previous sexual experiences, and conversely, excluding Plaintiff's testimony as to Murphy's previous sexual experimentation with knives and "blood sex."[29]

107. On October 7, 2022, Plaintiff filed a complaint with U.S. Department of Education – Office of Civil Rights ("OCR"), alleging that LETU discriminated against her on basis of her sex and disability. Specifically, she alleged that LETU failed to promptly and appropriately investigate and prosecute her Title IX complaint.

---

[29] "At the live hearing, each party's advisor will be permitted to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such questions will be conducted directly, orally, and in real time by the party's advisor and will never be conducted by a party personally."

108. On December 23, 2022, OCR issued Plaintiff a letter stating it was opening investigation into LETU. However, to date, OCR has not taken any further action on Plaintiff's complaint.

## COUNT 1: BREACH OF CONTACT
### (As to Defendant LeTourneau)

109. Plaintiff incorporates paragraphs 1–108 as if fully re-asserted herein.

110. "The relationship between a private school and its student has by definition primarily a contractual basis." *Eiland v. Wolf*, 764 S.W.2d 827, 838 (Tex. App. 1st Dist. 1989).

111. "A school's catalog constitutes a written contract between the educational institution and the patron, where entrance is under its terms." *University of Texas Health Science Center v. Babb*, 646 S.W.2d 502, 506 (Tex. App. 1st Dist. 1982).

112. Under Texas law, proof of a contract requires: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages sustained by the plaintiff as a result of the breach. *People's Capital and Leasing Corp. v. McClung*, 2020 WL 4464503 (E.D. Tex. August 4, 2020).

113. LETU's student handbook, Title IX, harassment, and anti-drug policies all constitute contractual promises made by LETU to its students.

114. The student handbook promises that "LeTourneau University does not discriminate on the basis of race, color, national or ethnic origin, _sex_, disability, veteran status or age in the administration of any of its educational programs . . . and other school-administered programs."

115. In its Title IX Policy, LETU promised that "University will *promptly and equitably respond* to the formal complaint in accordance with the provisions and procedures set forth [in the Policy]."

116. It also promised "a fair and impartial complaint resolution process." And that "Each complaint resolution process will require an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence."

117. The University further promised that "Credibility determinations will not be based on a person's status as a complainant, respondent, or witness."

118. And that cases will be decided by "Adjudicators . . . who do not have a conflict of interest or bias for or against complainants.

119. As detailed herein, the University breached these promises and others, causing Plaintiff to suffer damages.

### COUNT 2: PROMISSORY ESTOPPEL
**(As to Defendant LeTourneau and in the alternative to Count 1)**

120. Plaintiff incorporates paragraphs 1–108 as if fully re-asserted herein.

121. As detailed herein, LETU via its various policies, made several promises to Plaintiff as a student.

122. For example, that "sexual harassment or sexual misconduct, in any form . . . will not be tolerated at LeTourneau."

123. That "In compliance with federal and state laws, it is the policy of LeTourneau University to prohibit unlawful discrimination or harassment, including Sexual Misconduct, in any form." Under the Policy, "Sexual Misconduct" includes sexual assault and dating violence.

124. And that "The University will not tolerate Sexual Misconduct in any form [and] will promptly and equitably respond to all reports of Sexual Misconduct in order to take steps to eliminate the misconduct, prevent its recurrence and address its effects on any individual and the community."

125. Plaintiff enrolled and remained at LETU, paying tuition year after year in reliance on the University honoring its Policies and its commitment to its Christian ideals.

126. In so doing, she continued to assume that she would be safe, protected, and respected by the University and its Policies.

127. As detailed herein, Plaintiff suffered harm because of her reliance.

### COUNT 3: ACTUAL FRAUD
**(As to Defendant LeTourneau)**

128. Plaintiff incorporates paragraphs 1–108 as if fully re-asserted herein.

129. LETU, through its policies and personnel, represented to Plaintiff that it would faithfully, fairly, and honestly implement its various policies, including its Title IX and Sexual Assault policy.

130. LETU expressly, or at the very least implicitly, through its Handbook and Policies, represented to its students that it would apply those policies honestly, fairly, accurately, and evenly – without bias based on gender.

131. The elements of claim of actual fraud are "1) that a material misrepresentation was made; 2) the representation was false; 3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth; 4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Iraan-Sheffield Ind. School Dist. V. Kinder Morgan Prod. Co., LLC*, 657 S.W.3d 525, 535 (Tex. App. 2022).

132. "A claim for actual fraud therefore involves dishonesty of purpose or intent to deceive." *Id.* 133. "A fraud cause of action exists if the false representations be made with a view of reaching the third person to whom it is repeated, and for the purpose of influencing him." *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (2001).

134. "A defendant who acts with knowledge that a result will follows is considered to intend the result." *Samson Lone Star Limited Partnership v. Hooks*, 497 S.W.3d 1, 15 (Tex. App. 2016).

135. Before a promise to do something in the future can be actionable fraud, plaintiff must additionally plead and prove that at the very time such promise was made, the promissor did not intend to carry it out. *Morgan v. Box*, 449 S.W.2d 499, 504 (Tex.Civ.App.—Dallas 1969, no writ).

136. LETU is an accredited institution of higher learning that receives and relies upon federal funding. For instance, as a private university, it relies on access to federal financial aid to allow for the continued enrollment of students.

137. As such, LETU needs to comply with federal law, including Title IX, to preserve federal funding.

138. LETU crafted and issued its Sexual Assault/Title IX policy, at least in part, to comply with federal law and preserve its federal funding.

139. Upon information and belief, it further did so to provide a sense of safety and security in its current and future student body and to help preserve its pool of students and applicants. Absent such a policy, students (and their parents) would be apt to have misgivings about campus safety, possibly deterring their enrollment.

140. As such, it crafted and issued the Policy with the intent that prospective and current student rely upon its assurances and protections.

141. However, upon information and belief, at the time it issued this policy, LETU never intended to honor these promises as to female students or to hold male students responsible for their sexual misconduct.

142. Plaintiff's 2022 hearing was the first Title IX hearing ever held at LETU, despite Title IX existing since 1972 and the University since 1946.

143. Correspondingly, LETU knew that it had no intention of finding Murphy responsible regardless of the evidence.

144. Plaintiff enrolled and remained at LETU, paying tuition year after year in reliance on the University honoring its Policies and its commitment to its Christian ideals.

## COUNT 4: SEXUAL ASSAULT
### Violation of TX Penal Code §22.011 or §22.012 (As to Defendant Murphy)[30]

145.  Plaintiff incorporates paragraphs 1–108 as if fully re-asserted herein.

146. Texas Penal Code §22.011(a)(1)(C) states that a "person [who] intentionally or knowingly causes the sexual organ of another person without that person's consent, to contact or penetrate the . . . sexual organ of another person, including the actor" is guilty of sexual assault.

147. Under Texas Penal Code §22.011(b)(6) a sexual assault is "without consent of the other person if . . . (6) the actor has intentionally impaired the other person's power to appraise or control the other person's conduct by administering any substance without the other person's knowledge.

148. As detailed herein, Murphy intentionally drugged Plaintiff to the point if incapacitation, without her knowledge or consent, and proceeded to forcibly rub his penis over Plaintiff's vaginal area.

149. This series of assaults has caused Plaintiff considerable mental and emotional pain and anguish, resulting in her being diagnosed with PTSD.

---

[30] Which statute applies depends on the physical extent of the assault, *i.e.,* was there any penetration.

## DAMAGES

**Wherefore**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

150. Plaintiff adopts and re-alleges each paragraph set forth above as if fully set forth herein.

151. General and consequential damages in an amount to be proven at trial, but in no event less than $75,000.00, including, but not limited to: recovery of her tuition dollars for her final two semesters and any amounts paid in medical or psychiatric expenses.

152. Compensatory, consequential, and punitive damages in an amount to be proven at trial, but in no event less than $75,000.00, including, but not limited to: recovery of her tuition dollars for her final two semesters, any amounts paid in medical or psychiatric expenses, and emotional or mental anguish.

153. Any other relief the court deems appropriate, including costs, disbursements, interest, and reasonable attorney's fees.

## CLAIM FOR PREJUDGMENT AND POST-JUDGMENT INTEREST

154. Plaintiff herein claims interest at the maximum legal rate.

## JURY DEMAND AND PRAYER

155. Plaintiff requests that a jury be convened to try the factual issues of this case.

156. Plaintiff prays that judgment be entered in her favor against Defendants, jointly and severally, for all damages, as requested herein, the costs of bringing this action, for prejudgment and post-judgment interest at the maximum legal rate, and for such other relief, at law or in equity, to which she may be justly entitled.

Respectfully submitted,

*/s/ Jeffrey T. Embry*
Jeffrey T. Embry
State Bar No. 24002052
jeff@hossleyembry.com
Attorney-In-Charge
Matt Montgomery
State Bar No. 24041509
matt@hossleyembry.com
Margaret C. Pennell
State Bar No. 24116893
meg@hossleyembry.com
**HOSSLEY EMBRY, LLP**
515 S. Vine Ave.
Tyler, Texas 75702
Ph.  903-526-1772

**NESENOFF & MILTENBERG, LLP**
Andrew T. Miltenberg (Pro hoc vice admission pending)
Rodman W. Streicher (Pro hoc vice admission pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
T. (212) 736-4500
amiltenberg@nmllplaw.com
rstreicher@nmllplaw.com
**ATTORNEYS FOR PLAINTIFF**