IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| JANE DOE | § | |
|     Plaintiff | § | |
| | § | Case No. 2:25-CV-00590-JRG-RSP |
| v. | § | |
| | § | |
| LETOURNEAU UNIVERSITY and | § | |
| BENJAMIN MURPHY | § | |
|     Defendant. | § | |

---

## DEFENDANT LETORNEAU UNIVERSITY'S MOTION TO DISMISS PLAINTIFF'S ORIGINAL COMPLAINT

---

Holly McIntush, Lead Attorney
Texas Bar No. 24065721
hmcintush@thompsonhorton.com
Carolyn Adkins
Texas Bar No. 24124057
cadkins@thompsonhorton.com
THOMPSON & HORTON LLP
8300 N. MoPac Expressway, Suite 220
Austin, Texas 78759
(512) 615-2350 – Telephone
(713) 583-8884 – Facsimile

Kathryn E. Long
Texas Bar No. 24041679
klong@thompsonhorton.com
THOMPSON & HORTON LLP
500 North Akard Street, Suite 3150
Dallas, TX 75201
(972) 853-5515 – Telephone
(713) 583-8884 - Facsimile

ATTORNEYS FOR LETOURNEAU
UNIVERSITY

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ii

STATEMENT OF ISSUES ...................................................................................................1

OVERVIEW OF ALLEGATIONS .......................................................................................1

STANDARD OF REVIEW ...................................................................................................5

SUMMARY OF THE ARGUMENT ....................................................................................6

ARGUMENT & AUTHORITIES .........................................................................................8

I.      Jane Doe fails to plausibly allege a viable breach of contract claim.     8

        A.      Jane Doe does not allege an enforceable contract between her and
                LeTourneau. ...............................................................................................9

        B.      Even if a contract existed, Jane Doe does not plausibly allege a breach of any
                specific contractual provision. .................................................................12

        C.      Jane Doe does not allege that any alleged breach by LeTourneau caused her
                harm. .........................................................................................................17

II.     Jane Doe fails to plausibly allege a viable promissory estoppel claim.   18

        A.      Jane Doe's promissory estoppel claims asserting LeTourneau failed to uphold
                Christian ideals are not justiciable and should be dismissed. .................19

        B.      Jane Doe fails to plausibly allege any definite promise made by LeTourneau
                upon which Doe reasonably relied. ...........................................................20

        C.      Jane Doe fails to plausibly allege detrimental reliance. ..........................21

III.    Jane Doe fails to plausibly allege a viable fraud claim.  23

        A.      Jane Doe's fraud claims asserting LeTourneau failed to uphold Christian
                ideals are not justiciable and should be dismissed ..................................24

        B.      Jane Doe fails to plausibly allege that LeTourneau never intended to comply
                with representations made in its Handbook and Title IX Policy. ............24

        C.      Jane Doe fails to plausibly allege that her reliance on any statements made in
                the Handbook or Title IX Policy caused her injury. .................................25

CONCLUSION ......................................................................................................................26

CERTIFICATE OF SERVICE .............................................................................................28

Pursuant to Federal Rules of Civil Procedure 12(b)(6), LeTourneau moves to dismiss the claims asserted against it by Jane Doe in Plaintiff's Original Complaint (ECF No. 1). LeTourneau shows the following in support:

## STATEMENT OF ISSUES

1. Whether Jane Doe's breach of contract claims should be dismissed because she fails to plausibly allege an enforceable contract, a breach of a specific contractual provision, or that any alleged breach caused her harm.

2. Whether Jane Doe's promissory estoppel and fraud claims should be dismissed because the ecclesiastical abstention doctrine bars the Court from answering whether LeTourneau complied with Christian ideals.

3. Whether Jane Doe's promissory estoppel claims should be dismissed because she fails to plausibly allege a definite promise and detrimental reliance.

4. Whether Jane Doe's fraud claims should be dismissed because she fails to plausibly allege LeTourneau made misrepresentations with knowledge of falsity or that she was injured based on relying on LeTourneau's representations.

## OVERVIEW OF ALLEGATIONS

In the fall of 2021, Jane Doe began her senior year at LeTourneau University. ECF No. 1, ¶¶ 2, 14. Early in the semester, she began dating the accused student ("John Doe"), a fellow senior at LeTourneau.[1] *Id.* at ¶¶ 2, 14-16. Jane Doe and John Doe broke up after dating for around one month. *Id.* at ¶¶ 2, 15. Jane Doe alleges that, during the students' short-lived relationship, John Doe "push[ed] her [sexual] boundaries," despite claiming to respect her Christian values and decision not to engage in premarital sex. *Id.* at ¶¶ 18-21, 26. Jane Doe claims, for example, that John Doe constantly talked

---

[1] The individual Defendant in this case is a former student at LeTourneau University. To protect the student's privacy, LeTourneau will refer to the individual Defendant as John Doe throughout this motion.

about sex and asked her to engage in sexual activities and pressured her to experiment with "Bondage, Dominance, Submission, and Masochism," which ultimately progressed to painful choking. *Id.* at ¶¶ 26-27, 30-31. She further alleges that John Doe "would get on top of [her] and roughly pin her down, sometimes covering her mouth so she couldn't speak, and grinding his erect penis onto her genital area." *Id.* at ¶ 36.

Jane Doe alleges that after their breakup, she gained a new perspective about her sexual relationship with John Doe. *Id.* at ¶ 37. Specifically, "[w]ith the help of her friends, [she] eventually realized that [John Doe] had been repeatedly drugging and assaulting her" while they were dating. *Id.* at ¶ 42. Jane Doe claims that "[i]t wasn't until after their relationship ended that she realized [John Doe] had drugged her water with Rohypnol or gamma-hydroxybutyric acid (GHB), both common date rape drugs." *Id.* at ¶ 37. Her conclusion that she was drugged is based on John Doe allegedly always bringing water when she requested it, and rather than getting water from the sink, he brought her ice-cold water. *Id.* at ¶ 33. When considering their relationship in hindsight, Jane Doe determined that "[d]ue to her sexual inexperience, [she] did not realize she was being tricked into" performing sexual acts on John Doe without her consent. *Id.* at ¶ 39. Jane Doe alleges that she was diagnosed with PTSD and put on medications for severe depression and anxiety as a result. *Id.* at ¶ 54.

Following her revelation, Jane Doe filed a Title IX complaint with the University on December 2, 2021. *Id.* at ¶ 55; Ex. C at 1.[2] She alleged that John Doe committed Title IX sexual harassment, non-

---

[2] LeTourneau attaches as Exhibit C a copy of the Notice of Determination issued by the Title IX panel on June 30, 2022, which includes procedural information such as Jane Doe's December 2, 2021, filing date. The Court may properly consider this document, since Jane Doe refers to it in her Complaint and the Title IX determination is central to her claims. *See* ECF No. 1, ¶ 90; *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) ("In ruling on a motion to dismiss, the district court generally must not go outside the pleadings. However, the Court may consider documents attached to a motion to dismiss that are referred to in the plaintiff's complaint and are central to the plaintiff's claim.") (citations omitted). Moreover, the Court may consider documents outside the pleadings that provide information referenced in the complaint that is central to the claim and that assists the Court in determining whether a claim has been asserted. *See generally Carter v. Target Corp.*, 541 F. App'x 413, 416-417 (5th Cir. 2013) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-499 (5th Cir. 2000)) (considering external information to evaluate a limitations defense). Given that Jane Doe's claims require her to show that LeTourneau broke promises such as to "promptly" resolve Title IX complaints, the filing date is central

Title IX sexual harassment, sexual assault, and dating violence. *Id.* LeTourneau promptly responded to her complaint, initiating a no-contact order between Jane Doe and John Doe on December 9, 2021. *Id.* at ¶ 61. Then, after reviewing Jane Doe's complaint, LeTourneau issued a Notice of Allegations on December 22, 2021, outlining the allegations and potential policy violations to both Jane Doe and John Doe. *Id.* at ¶ 70. An independent Title IX investigator commenced a fact-finding investigation shortly thereafter. *Id.* at ¶¶ 72-74. The investigation required scheduling and conducting interviews with multiple LeTourneau students. *Id.* Following LeTourneau's winter break, the investigator interviewed Jane Doe on January 18, 2022, and John Doe on March 18, 2022. *Id.* at ¶ 73. The investigator interviewed non-party student witnesses on February 2 and April 1, 2022. *Id.* at ¶ 74.

While the Title IX investigation was in progress, Jane Doe contacted the University's Title IX coordinator on multiple occasions to express concerns regarding the December 9, 2021, no-contact order. *Id.* at ¶¶ 62-67. She alleged that on one occasion, John Doe "harass[ed]" her by honking at her while she was in a car pulling up to a stop sign. *Id.* at ¶¶ 62-63. On another occasion, she allegedly saw John Doe driving away from her apartment after Jane Doe's roommate came home to find their apartment door open. *Id.* at ¶ 66. Jane Doe reported these incidents to the University's Title IX coordinator, alleging that John Doe violated the no-contact order. *Id.* at ¶¶ 65, 67. After investigating the alleged no-contact order violations, including by having campus police inspect Jane Doe's apartment, the Title IX coordinator found insufficient evidence to show any violation. *See id.* at ¶¶ 64-67. Jane Doe alleges that the Title IX coordinator "did not believe" her and "express[ed] favoritism toward [John Doe]" by crediting his version of events. *Id.* at ¶ 64.

The Title IX investigation closed on April 4, 2022, 123 days after the complaint was filed. *Id.* at ¶ 77; Ex. C at 2. Letourneau's Title IX policy gives the parties ten days to inspect and review the

---

to her claims and her failure to specify the exact date should not prevent the Court from considering it in its analysis. *See* ECF No. 1, ¶ 115.

evidence obtained by the investigation, as well as submit written responses. *Id.* at ¶ 78; Ex. B at 29; 34 C.F.R. § 106.45(b)(5)(vi) (2020).[3] Jane Doe's advisor received the evidence on April 23, 2022, and she submitted her response on May 16, 2022. ECF No. 1, ¶ 78; Ex. C at 2.[4] LeTourneau's Title IX Policy requires the investigator to consider the parties' responses before finalizing the report. 34 C.F.R. § 106.45(b)(5)(vi) (2020); Ex. B at 30. The parties received copies of the investigation report on May 20, 2022. ECF No. 1, ¶ 79. The parties then had another ten days to review and respond to the report before any hearing could be held. 34 C.F.R. § 106.45(b)(5)(vi) (2020); Ex. B at 30.

The Title IX hearing was held June 1, 2022. *Id.* at ¶ 81. A hearing panel applied a preponderance of the evidence standard to determine whether it was more likely than not that John Doe committed sexual misconduct. *Id.* at ¶ 84. The panel issued its decision on June 30, 2022. *Id.* at ¶ 90. The panel decided that there was insufficient evidence to determine that John Doe engaged in any act constituting a violation of LeTourneau's sexual misconduct policy. *Id.* at ¶¶ 90-91. University policy provides the parties with two calendar days from the issuance of the decision to file an appeal. Ex. B at 40-41. Jane Doe filed an appeal seeking to overturn the decision on July 8, 2022. *Id.* at ¶ 96. The appeal officer ultimately upheld the panel's decision. *Id.* at ¶ 96.

Jane Doe now brings claims against LeTourneau centered entirely on the 2021-2022 Title IX

---

[3] LeTourneau attaches copies of the 2021-2022 Student Handbook and Title IX Policy to its motion as Exhibits A & B. As both documents are repeatedly referred to in Jane Doe's Original Complaint and are central to her claims, the Court may properly consider the documents in ruling on the present motion to dismiss. *Sullivan v. Leor Energy*, LLC, 600 F.3d 542, 546 (5th Cir. 2010) ("In ruling on a motion to dismiss, the district court generally must not go outside the pleadings. However, the court may consider documents attached to a motion to dismiss that are referred to in the plaintiff's complaint and are central to the plaintiff's claim.") (citations omitted). LeTourneau notes that Jane Doe inserts links to the Student Handbook within footnotes throughout her Complaint. However, those links lead to LeTourneau's current, 2024-2025 Student Handbook, not the Handbook applicable to Jane Doe during the events alleged in this lawsuit.

[4] The 2020 Title IX regulations are the rules that apply today and that applied during Jane Doe's Title IX process. The 2024 Title IX regulations were vacated by a United States District Court on January 9, 2025. *Tennessee v. Cardona*, 762 F. Supp. 3d 615 (E.D. Ky. 2025), as amended (Jan. 10, 2025). The vacatur applies nationwide, meaning the 2020 Title IX regulations are effective. *See* U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Title IX Enforcement Directive DCL (Feb. 4, 2025), *available at* https://www.ed.gov/media/document/title-ix-enforcement-directive-dcl-109477.pdf (last visited Jul. 24, 2025). However, many public resources, such as Westlaw and the National Archives' eCFR still default to the 2024 regulations.

investigation and, at bottom, the panel's decision finding insufficient evidence of sexual misconduct by John Doe. Each claim is based on allegations that LeTourneau's Title IX process was procedurally defective under the Student Handbook and associated Title IX Policy. Specifically, Jane Doe complains that the Title IX process took too long (ECF No. 1, ¶¶ 75, 81, 88, 115), she had insufficient time to present evidence at the hearing (*id.* at ¶¶ 82, 83, 102, 106), LeTourneau did not treat her with dignity and respect (*id.* at ¶¶ 98), and the Title IX coordinator and hearing panel members were biased in favor of John Doe (*id.* at ¶¶ 101, 103).

But Jane Doe does not assert Title IX claims. Instead, she alleges breach of contract, fraud, and promissory estoppel under Texas law.[5] She alleges that LeTourneau's Student Handbook and associated policies, including its Title IX Policy, constitute contracts between LeTourneau and its students, and that LeTourneau violated provisions of those contracts through its procedurally defective Title IX investigation. *Id.* at ¶¶ 109-119. In the alternative, Jane Doe alleges that LeTourneau made promises in the Handbook and Title IX Policy, which she relied on to her detriment. *Id.* at ¶¶ 120-127. Finally, Jane Doe alleges that LeTourneau committed actual fraud by making representations in the Handbook and Title IX Policy that it never intended to honor. *Id.* at ¶¶ 128-144. Jane Doe requests general, consequential, compensatory, and punitive damages based on tuition paid for her attendance at LeTourneau over her last two semesters, as well as amounts paid for medical or psychiatric expenses and emotional or mental anguish. *Id.* at ¶¶ 151, 152.

## STANDARD OF REVIEW

Under Rule 12(b)(6), the Court reviews the complaint and accepts well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). To pass muster, a complaint must allege "enough facts to state a claim to

---

[5] One reasonable explanation for this choice is that her allegations accruing during the 2021-2022 school year would be plainly barred by Title IX's two-year statute of limitations. *See King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 758 (5th Cir. 2015) (explaining that Texas's two-year personal injury limitations period applies to claims asserted under Title IX).

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A claim is not facially plausible unless the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factual allegations cannot rest on speculation. *Id.* The allegations in the complaint must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Ashcroft*, 556 U.S. at 678. Courts do not "presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)). When the alleged facts "do not permit the court to infer more than a mere possibility of misconduct," the complaint fails to show that the plaintiff is entitled to relief. *Ashcroft*, 556 U.S. at 679.

## SUMMARY OF THE ARGUMENT

Jane Doe attempts to squeeze Title IX-shaped claims into breach of contract, fraud, and promissory estoppel-sized holes. Unsurprisingly, the result is a pleading with plainly insufficient factual allegations that this Court should dismiss under Rule 12(b)(6).

Regarding Jane Doe's breach of contract claims, she fails to allege the existence of a valid, enforceable contract between her and LeTourneau. She posits that the LeTourneau Student Handbook and Title IX Policy are legally enforceable contracts. But both documents contain language that negates the existence of a contract under Texas law. Specifically, the Handbook includes express language notifying students that it may unilaterally modify terms and policies within the Handbook at will and without prior notice or student consent. The Title IX Policy includes language stating in plain terms that nothing within the Policy creates a contract between LeTourneau and its students.

Moreover, even if the Handbook or Title IX Policy constitute contracts, Jane Doe fails to allege the other required elements for breach of contract. She does not allege the breach of any specific contractual provision. Instead, she presents conclusory allegations without identifying provisions that require the University to do what Jane Doe claims the Title IX policy requires. She also fails to plausibly allege that any breach by LeTourneau caused her harm. She fails to plead facts to explain how the Title IX panel would have come to a different decision if LeTourneau had acted differently during the Title IX process.

Regarding Jane Doe's promissory estoppel claims, she fails to plausibly demonstrate how expressions of commitment to follow the Title IX Policy constitute specific promises made by the University that individual students will not experience sexual misconduct or be dissatisfied with the results of a Title IX investigation. She further fails to provide factual support for her contention that she would not have attended LeTourneau but for the promises made in the Handbook and Title IX Policy.

Finally, Jane Doe fails to meet the heightened pleading standard applicable to her fraud claims under Federal Rule of Civil Procedure 9(b). To show the element that LeTourneau made representations with knowledge of their falsity, she asserts in conclusory fashion that LeTourneau never intended to follow its Title IX Policy. But she backs up this assertion only with faulty logic that betrays her fundamental misunderstanding about the Title IX regulations. Namely, she alleges that her Title IX hearing was the first live hearing ever conducted by LeTourneau and argues that this number reveals that LeTourneau must have ignored countless sexual misconduct complaints prior to her hearing. However, since the Title IX regulations did not require a live hearing until August 2020, her reasoning crumbles under the slightest scrutiny. Jane Doe also fails to show any harm for the same reason she fails to show detrimental reliance for promissory estoppel; she offers bare speculation that

she would not have applied to LeTourneau and continued her education at the University if not for the representations made in its policies, without pairing that speculation with any factual support.

## ARGUMENT & AUTHORITIES

### I.    Jane Doe fails to plausibly allege a viable breach of contract claim.

Jane Doe alleges that LeTourneau's student handbook and associated policies "constitute contractual promises made by [LeTourneau] to its students." ECF No. 1, ¶ 113. She alleges that LeTourneau breached the promise made in its Student Handbook that "LeTourneau University does not discriminate on the basis of race, color, national or ethnic origin, sex, disability, veteran status or age in the administration of any of its educational programs . . . and other school-administered programs." *Id.* at ¶ 114. She further alleges that LeTourneau breached the following promises made within the University's Title IX Policy: 1) LeTourneau "will promptly and equitably respond to the formal complaint in accordance with the provisions and procedures set forth [in the Policy][;]" 2) LeTourneau will use a "fair and impartial complaint resolution process" that includes "an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence[;]" 3) "Credibility determinations will not be based on a person's status as a complainant, respondent, or witness[;]" and 4) cases will be decided by "[a]djudicators . . . who do not have a conflict of interest or bias for or against complainants." *Id.* at ¶¶ 115-118.

Under Texas law, the elements of a breach of contract claim are: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 545 (5th Cir. 2003). Jane Doe's breach of contract claims fail as a matter of law because she does not allege three of the four required elements: 1) she does not plausibly allege that either LeTourneau's Student Handbook or Title IX Policy are valid, enforceable contracts; 2) she does not

plausibly allege facts showing that LeTourneau breached a specific contractual provision; and 3) she does not plausibly show that any alleged breach caused her harm.

### A.    Jane Doe does not allege an enforceable contract between her and LeTourneau.

To properly plead a valid, enforceable contract, a plaintiff must allege: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 689 (5th Cir. 2018) (quoting *In re Capco Energy, Inc.*, 669 F.3d 274, 279-80 (5th Cir. 2012)).

The plain language of LeTourneau's Student Handbook and the Title IX Policy negate the last element—that the parties intended for it to be mutually binding. In relevant part, the 2021-2022 LeTourneau Student Handbook contains the following statement:

> While the policies and standards outlined in the handbook provide students an effective set of guidelines for personal conduct, the University *retains the right to enact additional policies and regulations, correct errors, or to modify existing policies as it determines*. Any policy or regulation updates will be made to the document online at www.letu.edu/studenthandbook. New or modified policies are effective immediately, unless otherwise noted. This handbook supersedes and replaces all previously published and/or online versions of the LeTourneau University Student Handbook.

Ex. A, page 4 (emphasis added). Moreover, LeTourneau's 2021-2022 Title IX Policy clearly states:

> Nothing in this Policy is intended to create a contract and this Policy does not constitute a contract, express or implied, between LeTourneau University and any student, employee, independent contractor, vendor, or other individual or entity. The University reserves the right to amend this Policy without prior notice.

Ex. B, page 1.

Courts applying Texas contract law consistently find that similar handbook and policy language negate the essential contract requirement that a school intended to be contractually bound. In *Doe v. William Marsh Rice University*, the Fifth Circuit faced similar facts and policy language and ultimately found that the private university's code and associated policies did not constitute an enforceable contract. 67 F.4th 702, 714 (5th Cir. 2023). The case centered around a complaint made

against a male student by a female student, alleging that he had recklessly failed to inform her that he had herpes before their sexual encounters. *Id.* at 705. The University found in favor of the female complainant, finding by a preponderance of the evidence that the male student's failure to disclose information about his herpes was a reckless action in violation of the University's Code. *Id.* at 706. This finding resulted in the student being released from the football program and having his football scholarship revoked. *Id.* at 706–07. The student sued Rice, alleging a state law breach-of-contract claim on the grounds that he was deprived of various entitlements conferred when he accepted an offer of admission and paid tuition to the University. *Id.* at 707. To support the breach of contract claim, the student cited provisions in the University Code that require students not to be treated differently because of their gender. *Id.* at 713. Ultimately, the Court was "not persuaded" by the contract argument. *Id.* The Court emphasized that, in addition to the student failing to allege any breach, "the Code expressly provides that '[t]he procedures used . . . by [the office in charge of investigating student complaints] are not those used in court cases and are not intended to create contractual rights[.]'" *Id.* at 714. Accordingly, because there was an "absence of contractual rights and the University's intent to be bound," the student's breach of contract claim was properly dismissed. *Id.*

Texas case law is replete with courts reaching the same result when faced with express contract disclaimer language within various codes and documents provided to students. *See, e.g.*, *Southwell v. Univ. of Incarnate Word*, 97 4 S.W.2d 351, 355–56 (Tex. App.—San Antonio, 1998, pet. denied) (student bulletin did not create contract between university and student because there was no intent to be bound when the college reserved the right to alter the bulletin without prior notice); *Tobias v. Univ. of Tex. at Arlington*, 824 S.W.2d 201, 211 (Tex. App.—Fort Worth 1991, writ denied) (finding express disclaimer of contract in university's catalog negates inference of any intent to be bound); *Eiland v. Wolf*, 764 S.W.2d 827, 838 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (finding that no enforceable contract existed because of statement in state university catalog that the provisions were

subject to change); *Omokwale v. Baylor Univ. - Louise Herrington Sch. of Nursing*, No. 3:23-CV-0354-X, 2024 WL 116428, at *2 (N.D. Tex. Jan. 10, 2024) (finding that statements in private university's student handbook that "[t]he provisions of the Student Policies and Procedures do not constitute a contract, express or implied, between Baylor University and any applicant, student, student's family, or faculty or staff member" and "Baylor reserves the right to change the policies, procedures, rules, regulations, and information at any time" expressly disclaim that the handbook is a contract).

Here, as in the above cases, the Title IX Policy expressly states that none of its terms are intended to create contractual rights, and the Student Handbook notifies students that its terms may be unilaterally modified at LeTourneau's will. This language reveals that, in creating and issuing the Student Handbook and associated policies to its students, LeTourneau intended only to provide helpful information and relevant guidelines to students attending the institution. There was no meeting of the minds regarding the creation of mutually binding contractual terms. As a helpful contrast, some Texas courts have held that a school's course catalog constitutes a written contract with students, when, instead of express disclaimer language, the catalog contains an express statement that a student can graduate under the terms of the catalog in place when they enrolled. *See Univ. of Tex. Health Sci. Ctr. v. Babb*, 646 S.W.2d 502, 506 (Tex. App.—Houston [1st Dist.] 1982, no writ). LeTourneau, on the other hand, notified students that the University reserves the right to modify terms and policies, and any modified versions would automatically supersede any previous versions.[6]

---

[6] The Student Handbook does include the following language offering students the ability to learn about and comment on proposed policy changes: "In those years that the Student Handbook is scheduled for major revision, the Office of Student Life will make every effort to identify to the Student Life Committee and the Executive Council of Student Government of the policies under consideration for revision in the next edition of the Handbook. Any student or student organization wishing to provide comment on policies and/or procedures in the Handbook is encouraged to submit such comments to Student Government representatives, in particular to members of the Student Life Committee of Student Senate." Ex. A at 4. This language bolsters the inference that LeTourneau did not intend to create a binding contract with its students. The language affirms that, while LeTourneau will try to consider students' opinions when making major revisions, students are not parties to a contract with the right to consent to any changes in its terms.

Because Jane Doe relies on documents that expressly refute an essential element of an enforceable contract, she fails to plausibly allege breach of contract against LeTourneau. Accordingly, the Court should dismiss Jane Doe's breach of contract claims under Rule 12(b)(6).

**B.      Even if a contract existed, Jane Doe does not plausibly allege a breach of any specific contractual provision.**

To plead a breach of contract claim, a plaintiff must identify a specific provision of the contract that was allegedly breached. *Watson v. Citimortgage, Inc.*, 814 F.Supp.2d 726, 732 (E.D. Tex. 2011); *Garrison v. Select Portfolio Servicing, Inc.*, No. 5:14-CV-337-DAE, 2014 WL 4187207, at *5 (W.D. Tex. Aug. 21, 2014) (quoting *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. 2014)). This is because a breach of contract occurs only when a party fails or refuses to perform an act that it has *expressly* promised to perform. *Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848, 855 (E.D. Tex. 2004), aff'd, 133 F. App'x 944 (5th Cir. 2005) (citing *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)); *see also Gonzales v. Columbia Hosp. at Med. City Dall. Subsidiary LP*, 207 F. Supp. 2d 570, 575 (N.D. Tex. 2002) (citing *Methodist Hosps. of Dall. v. Corp. Communicators, Inc.*, 806 S.W.2d 879, 882 (Tex. App.—Dallas 1991, writ denied)).

In alleging breach of contract, Jane Doe does not plausibly plead that LeTourneau breached any specific provision of the Student Handbook or the Title IX Policy. First, regarding Jane Doe's chief complaint that the Title IX process took too long, she simply emphasizes the language in the Policy that assures students that LeTourneau will "promptly and equitably respond" to formal Title IX complaints. *See* ECF No. 1, ¶¶ 60, 115, 124; Ex. B at 2, 23. She more specifically complains about the length of the investigation, which lasted 123 days, alleging that a "decision should [have been] reached within 45 days of a report" *Id.* at ¶ 75. But Jane Doe hides the full language of the relevant timeline provisions in a footnote. *See id.* at n. 26. In full, the provision states:

The time frame for the investigation generally is within (i) forty-five (45) calendar days *from the assignment of the Investigator*[7] or (ii) if, after the date the Investigator is assigned, the parties receive an amended notice of allegations that includes new allegations or new parties, forty-five (45) calendar days from the date of the amended notice of allegations. In some cases, more time may be required. *In cases involving allegations of Title IX Sexual Harassment, the University will strive to complete the initial investigation in this 45-day time frame*, but the final investigation report will not be completed until after the review of directly related evidence.

Ex. B, page 29 (emphasis added). Additionally, Jane Doe fails to include the following relevant provision:

In any Sexual Misconduct complaint resolution process, the process may include additional days between these phases as the University transitions from one phase to another. . . . In some cases, extensions of the applicable time frames may be necessary. The Title IX Coordinator may grant reasonable extensions to the time frames set forth in this policy when warranted by the circumstances. For example, extensions may be granted if the University has been asked to delay its procedures during the evidence gathering stage of a criminal investigation, if the reported allegations are particularly complex (including, without limitation, allegations that involve multiple incidents and/or multiple individuals), if new parties or new allegations are added in an amended notice of allegations, if parties or witnesses are not available, due to unsuccessful attempts at informal resolution, any intervening school break, the need for language assistance or accommodation of disabilities, or for other unforeseen circumstance.

*Id.* at 50.

Jane Doe's conclusory allegation that, simply because the investigation lasted more than 45 days, LeTourneau violated its Title IX Policy is plainly contradicted by the complete language of the relevant provisions. As the Policy is repeatedly referred to throughout the Complaint and is central to her claim as the alleged contract, the Court properly considers the entire document when determining the sufficiency of Jane Doe's allegations. *Sullivan v. Leor Energy*, LLC, 600 F.3d 542, 546 (5th Cir. 2010). There is no provision stating that the University must complete the investigation within 45 days or any other specific number of days. Instead, the Policy provides a general timeline as a baseline goal, with several built-in exceptions specifically applicable to Jane Doe's allegations. For example, taking her allegations as true, it is clear that her Title IX complaint against John Doe involved complex

---

[7] Jane Doe incorrectly starts her timeline with the filing of her report, rather than the day the investigator was assigned.

allegations about multiple incidents throughout their relationship. *See* ECF No. 1, ¶¶ 14-45. The Complaint also reveals that there was an intervening winter break. *Id.* at ¶ 54. While the Court must accept Jane Doe's allegations as true and view such allegations in her favor, the Court may not, like Jane Doe, ignore the plain, full text of the provision relied on to show alleged breach of contract. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) (In construing a contract, "we consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless. No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole.").

Twice in her Complaint, Jane Doe refers to a purported 180-day deadline without citing any provision in the Handbook or Title IX Policy. She alleges that LeTourneau had to conduct the hearing within 180 days of the complaint. ECF No. 1, ¶ 88. She also appears to contend that the entire Title IX process, up to and including an appeal, had to be completed within 180 days. *Id.* at ¶ 75. Regardless of when Jane Doe believes a 180-day timeline applied, there is no such provision in LeTourneau's Handbook or Title IX Policy, which means she cannot show that LeTourneau failed or refused to perform an act that it *expressly* promised to perform. *See Cronus Offshore, Inc.*, 369 F. Supp. 2d at 855. And, even if this 180-day deadline existed, it would necessarily be dependent on the interim deadlines being met. Here, Jane Doe's allegations reveal that her own actions delayed the Title IX process. For example, she was provided with additional time to submit her evidence response statement, submitting her response 18 days after John Doe submitted his response. *Compare id.* at ¶ 78 *with* Ex. B at 29 and 34 C.F.R. § 106.45(b)(5)(vi) (2020). The investigator could not finalize her report until she reviewed and considered both evidence response statements. 34 C.F.R. § 106.45(b)(5)(vi) (2020); Ex. B at 30. Delays were also caused by mandatory waiting periods provided in the Title IX regulations and LeTourneau policy. For instance, after receiving the final investigation report, the parties had ten days (until May 30, 2022) to review the report before a hearing could be held. 34 C.F.R. § 106.45(b)(5)(vi)

(2020); Ex. B at 30. The June 1, 2022, hearing was just two calendar days and one business day after the mandatory review period expired—and just one day short of Jane Doe's non-existent 180 deadline. *Id.* at ¶ 81. Considering the multiple delays outside of LeTourneau's control, it is notable that it came as close to Jane Doe's imaginary deadline as it did.

Jane Doe also alleges that the hearing panel did not provide her with enough time to present her evidence. *See* ECF No. 1, ¶¶ 82, 83, 102, 106. But she does not cite any specific provision in the Title IX Policy outlining how much time a panel should provide to each party—perhaps because the Policy is silent on the issue. As Jane Doe emphasizes in her Complaint, the Policy requires a "fair and impartial" complaint resolution process. *Id.* at ¶ 116; Ex. B at 23. She does not provide facts explaining how the hearing time limits prevented a fair and impartial process. She does not, for example, allege that John Doe received more time to present his evidence, nor that she would have presented any additional evidence not contained in the investigation if given more time. Furthermore, she acknowledges that she was given the opportunity to respond to the directly related evidence and later to the investigation report (ECF No. 1, ¶¶ 78-79), all of which were made available to the hearing panel. *See* Ex. C at 3 ("The Title IX Coordinator compiled the adjudication file, containing the investigative report and attachments, as well as [Jane Doe's] response to the report, and shared the file with the Title IX Hearing Panel. . . .The Panel reviewed the adjudication file and the evidence presented at the live hearing.").

Jane Doe alleges that she was given insufficient notice about hearing procedures, specifically complaining that she was provided with time limits the "night before the hearing[.]"[8] *Id.* at ¶ 82. But, again, she does not cite any specific provision requiring LeTourneau to advise parties about the hearing procedure within a certain amount of time before the hearing, and no such provision exists. *See* Ex. B

---

[8] Le Tourneau disputes the veracity of this allegation, but assumes it is true for purposes of this motion.

at 32-34 (describing the adjudication process and hearing procedures for cases alleging Title IX sexual harassment). LeTourneau cannot breach a non-existent provision of a contract. *See Cronus Offshore, Inc.*, 369 F. Supp. 2d at 855 (noting that "[a] breach occurs when a party fails or refuses to perform an act that it has expressly promised to perform.").

Finally, Jane Doe alleges in conclusory fashion that LeTourneau violated provisions promising a "fair and impartial complaint resolution process" that includes "an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence." ECF No. 1, ¶ 116. She also points to provisions stating that "Credibility determinations will not be based on a person's status as a complainant, respondent, or witness[;]" and cases will be decided by "Adjudicators . . . who do not have a conflict of interest or bias for or against complainants." *Id.* at ¶ 117. But Jane Doe does not pair these broad and conclusory contentions with alleged *facts* tending to show that the Title IX coordinator or panel members were biased in favor of John Doe, the process was unfair or partial, or the panel made improper credibility determinations. Instead, she appears to rely on her bare, speculative belief that the panel members simply must have been biased, and the process simply must have been unfair, in order to find in John Doe's favor. *See* ECF No. 1, ¶ 103 ("There was no reason, apart from bias, for the University to credit [John Doe's] story over Plaintiff's."); ECF No. 1, ¶ 64 ("Expressing favoritism toward [John Doe], Dr. Morgan credited his version of events and accused Plaintiff and her father of lying."). Courts do not "presume true a number of categories of statements, including . . . conclusory statements[] and naked assertions devoid of further factual enhancement." *Armstrong*, 60 F.4th at 269 (quoting *Morgan*, 659 F.3d at 370).

Jane Doe also relies on allegations that John Doe "was caught in several lies at the trial" and had sex and drug paraphernalia found in his room in order to show bias by the panel. *See id.* at ¶ 103. Even taking these bald accusations as true, Jane Doe does not explain why these facts show bias,

rather than reveal the inherent reality that the panel had to weigh favorable and unfavorable evidence presented by both sides at the hearing.

Because Jane Doe fails to identify any specific provision of the alleged contracts that LeTourneau allegedly breached, her contract claims against the LeTourneau fail, and the Court should dismiss the claims under Rule 12(b)(6).

### C.     Jane Doe does not allege that any alleged breach by LeTourneau caused her harm.

To properly plead that a defendant's breach caused the plaintiff's injury, a plaintiff must allege facts showing that the injury was the natural, probable, and foreseeable consequence of the breach. *Mead v. Johnson Group,* 615 S.W.2d 685, 687 (Tex. 1981); *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.). Jane Doe's alleged injury in this matter, at bottom, is the fact that LeTourneau's Title IX process resulted in a finding with which she adamantly disagrees. But she does not provide factual allegations detailing how or why the panel would have reached a different result if LeTourneau had acted differently. For example, regarding Jane Doe's principal complaint that the Title IX investigation took too long, she does not attempt to explain how the panel would have reached a different result if the process had taken less time or if the investigation had concluded within 45 days. She does not make any allegation that the length of the complaint resolution process made it harder for her to obtain and present evidence, rendered witnesses unavailable, altered the evidentiary materials available to the panel, or otherwise hampered her participation in the process. She also does not allege any additional evidence she would have presented to the panel if she had been given additional time to present during the hearing. And her allegations of bias are too conclusory for the court to credit her assertion that bias caused the panel to issue a decision in John Doe's favor.

Additionally, any injury Jane Doe sustained from John Doe's alleged sexual misconduct cannot plausibly serve as the injury for contract claims against LeTourneau. The alleged breaches occurred after Jane Doe and John Doe broke up and she filed her December 2021 Title IX complaint, during

17

the investigation and live hearing. Her allegations fail to plausibly explain how any of the University's alleged actions or inactions occurring after December 2021 were causally related to John Doe's actions, which allegedly occurred "[b]etween October 31 and November 17, 2021[.]" ECF No. 1, ¶ 2.

Because Jane Doe fails to plausibly allege that any breach by LeTourneau caused the unfavorable Title IX decision, her contract claims fail, and the Court should dismiss the claims.

## II.    Jane Doe fails to plausibly allege a viable promissory estoppel claim.

In the alternative to her breach of contract claims against LeTourneau, Jane Doe alleges promissory estoppel. Specifically, she alleges that she "enrolled and remained at [LeTourneau], paying tuition year after year in reliance on the University honoring its Policies and its commitment to its Christian ideals." ECF No. 10, ¶ 125. Jane Doe specifically cites to promises such as that "sexual harassment or sexual misconduct, in any form . . . will not be tolerated at LeTourneau[;]" that "In compliance with federal and state laws, it is the policy of LeTourneau University to prohibit unlawful discrimination or harassment, including Sexual Misconduct, in any form[;]" and that LeTourneau will "promptly and equitably respond to all reports of Sexual Misconduct in order to take steps to eliminate the misconduct, prevent its recurrence and address its effects on any individual and the community." *Id.* at ¶¶ 122–24. She further contends that she relied on LeTourneau's promises by assuming she would be safe, protected, and respected by the University and its Policies. *Id.* at ¶ 126.

To the extent Jane Doe asserts LeTourneau harmed her by breaking a promise to uphold Christian values, such claims are not within the Court's power to adjudicate. Moreover, Jane Doe's promissory estoppel claims fail as a matter of law because she does not plausibly allege that LeTourneau made a definite and specific promise upon which it was reasonable for her to rely. Jane Doe further fails to present sufficient facts detailing how she was harmed through her reliance.

A.    **Jane Doe's promissory estoppel claims asserting LeTourneau failed to uphold Christian ideals are not justiciable and should be dismissed.**

The ecclesiastical abstention doctrine stands for the proposition that the First Amendment prohibits civil courts from exercising jurisdiction over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14 (1976); *see also Patton v. Jones*, 212 S.W.3d 541, 547–48 (Tex. App.—Austin 2005, pet. denied) (ecclesiastical abstention doctrine "prevents secular courts from reviewing many types of disputes that would require analysis of 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required'"). Courts properly dismiss claims asking them to weigh in on inherently religious matters. *See Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 13 (Tex. 2008) (dismissing case involving ecclesiastical issues for want of jurisdiction "[b]ecause providing a remedy . . . in this case would require us to take sides in what is essentially a religious controversy"); *Nayak v. MCA, Inc.*, 911 F.2d 1082, 1082–83 (5th Cir. 1990) (affirming Rule 12(b)(6) dismissal of defamation lawsuit seeking to enjoin the distribution and presentation of the movie "The Last Temptation of Christ" because the case did not present a "justiciable question before a federal court").

The ecclesiastical abstention doctrine applies to claims against a private religious school that implicate inherently religious matters, such as promissory estoppel claims based on promises to uphold Christian values. *See In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d 347, 353 (Tex. App.—Dallas 2017, no pet.) (applying ecclesiastical abstention doctrine to faith-based school). Accordingly, to the extent Jane Doe complains that LeTourneau broke its promise[9] to honor its commitment to its Christian

---

[9]  Doe does not specifically allege that failure to adhere to its Christian values constituted a breach of contract. ECF No. 1, ¶¶ 109-118. Instead, she alleges that LeTourneau breached the enumerated "promises and others." Without conceding this is sufficient to state a breach of contract claim, LeTourneau notes that, to the extent the unidentified other promises are related to its Christian ideals, the ecclesiastical abstention doctrine bars the Court's consideration of that claim.

ideals, and asks the Court to agree with her determination, she fails to present a justiciable question for the Court's consideration. Accordingly, these claims must be dismissed.[10]

**B.    Jane Doe fails to plausibly allege any definite promise made by LeTourneau upon which Doe reasonably relied.**

The elements of promissory estoppel are 1) a promise, 2) foreseeability by the promisor that the promisee would rely on the promise, and 3) substantial reliance by the promisee to his detriment. *See English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983). "To support a finding of promissory estoppel, the asserted promise must be sufficiently specific and definite that it would be reasonable and justified for the promisee to rely upon it as a commitment to future action." *Guajardo v. JP Morgan Chase Bank*, N.A., 605 F. App'x 240, 248 (5th Cir. 2015) (citing *Comisky v. FH Partners, LLC*, 373 S.W.3d 620, 635 (Tex. App.—Houston [14th Dist.] 2012, pet. denied)).

LeTourneau's statements expressing its commitment to "prohibit[ing] unlawful discrimination or harassment, including Sexual Misconduct" and its announcement that such misconduct "will not be tolerated" are not the kind of definite, specific promises required to support promissory estoppel claims. ECF No. 1, ¶¶ 123, 124. These statements are resolute expressions of hope and expectation that students will refrain from sexual misconduct and that complaints will be adjudicated fairly and equitably. *See Walker v. Walker*, 631 S.W.3d 259, 265 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (promise underlying claim for promissory estoppel must be "more than mere speculation concerning future events, a statement of hope, or an expression of opinion, expectation, or assumption").

The promises LeTourneau makes regarding sexual misconduct on campus, by nature, do not commit LeTourneau to definite and specific future action with respect to individual students who may unfortunately experience sexual misconduct. While LeTourneau steadfastly commits itself to honoring

---

[10] Courts in the Fifth Circuit properly dismiss cases based on the ecclesiastical abstention doctrine both under Rule 12(b)(6) and 12(b)(1). *See McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 348 (5th Cir. 2020) (citing cases applying the doctrine under different rules, but declining to resolve the question whether one method is preferable).

its sexual misconduct policies and properly adjudicating complaints, it simply cannot promise its students that they will never experience sexual misconduct. LeTourneau also never promises that each Title IX complainant will be satisfied with the result of the University's Title IX investigation. It would not be reasonable for the University to promise, or for its students to assume, that LeTourneau can ensure that no sexual misconduct ever occurs on its campus, or that there will be sufficient evidence for a panel to find in favor of complainants in every case. At most, the policy promises that it will respond using the formal resolution process laid out in its Title IX policy, which LeTourneau did in fact do. Ex. B at 28; ECF No. 1, ¶¶ 70, 72-74, 78-79, 81. As discussed in Section I. B, any time frames within the process are expressed as aspirations, not promises.

Because Jane Doe cannot show a definite and specific promise made by LeTourneau upon which she relied, her promissory estoppel claims fail and should be dismissed under Rule 12(b)(6).

### C.    Jane Doe fails to plausibly allege detrimental reliance.

In alleging promissory estoppel, Jane Doe broadly asserts in this count's cause of action setting that "[she] enrolled and remained at [LeTourneau], paying tuition year after year in reliance on the University honoring its Policies and its commitment to its Christian ideals." ECF No. 1, ¶ 125. Accordingly, her contention regarding detrimental reliance appears to be that she would not have applied to attend LeTourneau in the first place and would not have returned as a student each year, had LeTourneau's policies not contained explicit promises that it does not tolerate sexual misconduct. These general and speculative allegations do not establish detrimental reliance. And while she incorporates the facts and conclusions alleged in "paragraphs 1-108," those paragraphs say nothing about her reliance and plead no facts in support of her conclusory assertion.

To show detrimental reliance, the plaintiff must demonstrate that she materially changed her position in reliance on the defendant's promise. *See English*, 660 S.W.2d at 524 (finding no promissory estoppel when plaintiff could not show he would not have taken his detrimental actions if defendant

had not made promise); *Sandel v. ATP Oil & Gas Corp.*, 243 S.W.3d 749, 753 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (finding that demonstrating failure to seek another job was insufficient to show detrimental reliance; employee was required to show that but for promises made in stock option letter, he would have stopped working for employer).

Jane Doe provides no factual detail that would allow the Court to plausibly infer that the "promises" made in LeTourneau's Title IX Policy were the deciding factors in her choices to enroll in LeTourneau and to continue her education at the institution. For instance, she does not specifically allege that she read the Policy and particular promises prior to applying to LeTourneau or before the start of each school year. *See L.G. Motorsports, Inc. v. NGMCO*, Inc., No. 4:11CV112, 2014 WL 1267114, at *4 (E.D. Tex. Mar. 27, 2014), aff'd, 600 F. App'x 296 (5th Cir. 2015) (finding plaintiff failed to show detrimental reliance when it had already made the relevant payment "weeks before" defendant made the alleged promise). Nor does she plead that she only applied to or considered schools that made such "promises." While she incorporates the facts and conclusions alleged in "paragraphs 1-108," into the promissory estoppel cause of action section of her complaint, those paragraphs say nothing about how or why she made her decision to attend LeTourneau or that would demonstrate her reliance on LeTourneau's "commitment to its Christian ideals." ECF No. 1, ¶¶ 120, 125. She appears to expect the Court to take her solely at her word, provided in hindsight following a disappointing Title IX hearing result, that she would not have applied to LeTourneau if the University did not assure its students that it does not tolerate sexual misconduct, and that she would have withdrawn prior to her senior year if that year's version of the Handbook or policies failed to include the assurances.

While the Court must accept well-pleaded facts as true, it must "not [ ] strain to find inferences favorable to the plaintiff." *R2 Invs. LDV v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005). Accepting Jane Doe's barebones pleadings would require the Court to strain to make inferences about what she would

have decided as a graduating high school student considering her options for college and navigating the numerous factors that play a role in the college application process.

Moreover, LeTourneau is subject to the regulations of Title IX by virtue of accepting federal funds, not because it chooses to reiterate its legal obligations under Title IX in its written policies. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) (explaining contractual nature of Title IX). Indeed, federal regulations *require* LeTourneau to adopt and publish a Title IX policy and grievance procedures that align with the regulatory requirements. 34 C.F.R. § 106.8 (2020). In this context, it is not plausible to contend that the policy statements themselves led any individual student to change their position or that, without the expressed statements, students would not still be aware of LeTourneau's obligation to not discriminate on the basis of sex and not tolerate sexual misconduct. Such statements are required of all educational institutions that receive federal funds from the Department of Education. *Id.* at §§ 100.2, 106.8. That almost every college in the country is also required to adopt and publish a policy "that the recipient does not discriminate on the basis of sex" and adopt a grievance procedure that "[t]reats complainants and respondents equitably" and complies with the federal regulations, makes it implausible that this statement played any role in her decision. *Id.*

Because Jane Doe's fails to plausibly allege detrimental reliance, her promissory estoppel claim fails.

## III.    Jane Doe fails to plausibly allege a viable fraud claim.

Jane Doe alleges that LeTourneau made fraudulent misrepresentations in its Handbook and Title IX Policy because LeTourneau never intended to comply with its promise to apply its sexual misconduct policies "fairly, accurately, and evenly[.]" ECF No. 1, ¶ 130. But her claim fails as a matter of law because she fails to sufficiently allege the essential elements of fraud, including that LeTourneau made misrepresentations with knowledge of falsity.

23

**A.    Jane Doe's fraud claims asserting LeTourneau failed to uphold Christian ideals are not justiciable and should be dismissed**

For the same reasons explained regarding Jane Doe's promissory estoppel claims, the Court should dismiss any fraud claims that rely on alleged failure to uphold Christian values. *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 353.

**B.    Jane Doe fails to plausibly allege that LeTourneau never intended to comply with representations made in its Handbook and Title IX Policy.**

In Texas, fraud requires "(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury." *Sugg v. Midwestern Univ.*, 105 F.4th 345, 356 (5th Cir. 2024) (citing *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018)). When the allegedly fraudulent representation is in the form of a promise to perform future action, a plaintiff must allege and ultimately prove that the defendant made the promise with no intention of performing the future action. *International Bus. Machs. Corp. v. Lufkin Indus.*, 573 S.W.3d 224, 228 (Tex. 2019); *Spoljaric v. Percival Tours*, Inc., 708 S.W.2d 432, 434 (Tex. 1986).

Moreover, plaintiffs asserting state common law fraud are required to meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b) by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (finding "no principled reason why the state claims of fraud should escape the pleading requirements of the federal rules").

Jane Doe alleges "upon information and belief, at the time it issued [its Title IX Policy], [LeTourneau] never intended to honor [its] promises as to female students or to hold male students responsible for their sexual misconduct." ECF No. 1, ¶ 141. But the only factual allegation she provides to support such an inference is that "[her] 2022 hearing was the first Title IX hearing ever held at [LeTourneau], despite Title IX existing since 1972 and the University since 1946." *Id.* at ¶ 142.

From this allegation, she leaps to the conclusion that "[c]orrespondingly, [Letourneau] knew that it had no intention of finding [John Doe] responsible regardless of the evidence." *Id.* at ¶ 143. She provides no facts to support that leap.

Jane Doe's allegation and suggested inference reveal a fundamental misunderstanding about the relevant Title IX regulations. Namely, the Title IX regulations did not require a live hearing until August 14, 2020. *See* 34 C.F.R. § 106.45(b)(6)(i) (2020) ("For postsecondary institutions, the recipient's grievance process must provide for a live hearing."). The prior regulations simply required educational institutions receiving federal funds "to adopt and publish grievance procedures providing for prompt and equitable resolution of complaints that a recipient is discriminating based on sex." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,028 (May 19, 2020) (preamble). Accordingly, LeTourneau revised its policy on August 11, 2020. Ex. B at 53. Thus, Jane Doe's suggested inference that because LeTourneau had not conducted a live hearing prior to 2022, therefore LeTourneau never intended to apply its recently adopted Title IX Policy, simply does not follow. While the Court must accept Jane Doe's allegations as true, it should only accept reasonably supported inferences.

Thus, Jane Doe fails to even plausibly allege an essential element of common law fraud—much less meet the heightened pleading requirement under Rule 9(b).

### C.    Jane Doe fails to plausibly allege that her reliance on any statements made in the Handbook or Title IX Policy caused her injury.

As with Jane Doe's promissory estoppel claim, she alleges in asserting fraud that she would simply not have chosen to attend LeTourneau in the first place, and continued to receive her education at LeTourneau, if not for the representations made in its Handbook and Title IX Policy. *See* ECF No. 1, ¶ 144 ("Plaintiff enrolled and remained at LETU, paying tuition year after year in reliance on the University honoring its Policies and its commitment to its Christian ideals."). As already explained, this allegation is far too speculative and conclusory to plausibly support the essential element of

detrimental reliance. Jane Doe provides no factual detail allowing the Court to make the reasonable inference that she in fact would not have applied to LeTourneau or returned for her senior year if the Title IX Policy did not state that the University followed Title IX legal requirements, as it is required by the Title IX regulations to do.

In addition, as with her breach of contract claim, Jane Doe has not alleged facts that suggest the alleged deadline violations during the Title IX complaint process led to the finding that there was insufficient evidence to show that John Doe violated the University's policies. And Jane Doe's allegations of bias are conclusory and not supported by any factual allegations. *See* Section I.C, *infra*.

Because Jane Doe fails to plausibly allege essential elements of fraud, the Court should dismiss her claims under Rule 12(b)(6).

## **CONCLUSION**

For the foregoing reasons, Letourneau University prays that the Court will grant this motion and dismiss Jane Doe's claims for breach of contract, promissory and estoppel.

Respectfully submitted,

*/s/ Holly McIntush*
Holly McIntush
Texas Bar No. 24065721
hmcintush@thompsonhorton.com
Carolyn Adkins
Texas Bar No. 24124057
cadkins@thompsonhorton.com
THOMPSON & HORTON LLP
8300 N. MoPac Expressway, Suite 220 Austin
Texas 78759
(512) 615-2350 – Telephone
(713) 583-8884 – Facsimile

Kathryn E. Long
Texas Bar No. 24041679
klong@thompsonhorton.com
THOMPSON & HORTON LLP
500 North Akard Street, Suite 3150
Dallas, TX 75201
(972) 853-5515 – Telephone
(713) 583-8884 - Facsimile

**Counsel for LeTourneau University**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Motion was served upon all counsel of record on July 25, 2025, via the Court's ECF/CMF electronic service system as follows:

Rodman Wells Streicher
Nesenoff & Miltenberg, LLP
363 Seventh Avenue
5th Floor
New York, NY 10001-3904
212-736-4500
Email: rstreicher@nmllplaw.com


Jeffrey Todd Embry
Hossley & Embry LLP - Tyler
515 South Vine Ave.
Tyler, TX 75702
903/526-1772
Fax: 903/526-1773
Email: jeff@hossleyembry.com


                              */s/ Holly McIntush*
                              Holly McIntush

28