# EXHIBIT C

CONFIDENTIAL

June 30, 2022

To:     ███████████, Complainant
        ███████████, Respondent

**NOTICE OF DETERMINATION**

### I.   <u>Procedural Steps</u>

On December 2, 2021, ███████████ filed a formal Title IX complaint against ███████████ under the LeTourneau University ("LeTourneau" or the "University") Sexual Misconduct Policy (the "Policy"). ████████ alleged that on multiple occasions between October 31, 2021, and November 17, 2021, ████ engaged in unwelcome sexual comments, advances, attention, propositions, and requests for sexual favors. ██████ also alleged that, during the same time frame, ███ drugged her and then placed his hands on her throat, spanked her, and pinned her arms in a sexual manner that was not welcome. Additionally, ███████ alleged that, during the same time frame, ████ touched her breasts, rubbed his clothed genitals on her clothed genitals, and had her touch his penis either while she was drugged or through coercion.

Based on ████████'s complaint, the Title IX Coordinator determined that there was sufficient information to go forward with an investigation of possible violations of the Policy by ███. The University responded to the complaint in accordance with its Formal Resolution Process under the Policy. On December 22, 2021, the University issued a Notice of Allegations based on ███████'s complaint, alleging potential policy violations against ████ of Title IX Hostile Environment Harassment, Non-Title IX Sexual Harassment, Sexual Assault, Dating Violence, and Domestic Violence.

The investigation was conducted by Caitlin Gehlen, an investigator with trainED. The investigator conducted a fact-gathering investigation by interviewing the parties and witnesses and gathering other evidence.

Both ████████ and ████ participated in the investigation and were interviewed by the investigator. ████████ was interviewed on January 18, 2022 and March 18, 2022. ████ was interviewed on January 20, 2022 and March 24, 2022. The University informed both parties of their right to be accompanied to meetings by an advisor of their choice. ████████ was accompanied by an attorney advisor to her March 18, 2022 interview; ████ was accompanied by an attorney advisor to both of his interviews.

In addition to conducting interviews of ████████ and ████, the investigator interviewed witnesses ████████ on February 2, 2022, ████████████ on February 2, 2022, and ████████████ on April 1, 2022.

The investigator gave both parties an opportunity to identify relevant evidence and suggest witnesses whom they believed the investigator should interview. The three witnesses identified by ██ were interviewed. The witness identified by ████ informed the investigator, through the witness's attorney, that she would not participate in the investigation. The parties were also given the opportunity to suggest questions the investigator should consider asking of the other party.

In addition to conducting interviews, the investigator reviewed records, documentation, and emails provided by the University, the parties, and the witnesses. This additional evidence included ████'s December 14, 2021 Complaint and Account; the ████ December 22, 2021, Notice of Allegations; ██'s December 22, 2021 written statement regarding the allegations; undated text messages between ████ and ██ during the course of their relationship, provided by ████; undated text messages between ████ and ██ regarding a Tik Tok video, provided by ████; a Tik Tok video that ████ sent to ████ during their relationship; undated text messages between ████ and ██ during the course of the relationship, provided by ██; text messages dated October 28-31, 2021 between ████ and ██ regarding the relationship with ██, provided by ████; text messages dated October 14 to November 15, 2021 between ██ and ████ regarding the relationship with ██, provided by ████; undated text messages between ████ and her RA, ████████, regarding a visit to the hospital for drug testing, provided by ████; a November 22, 2021 message to ████ from ████, paramedic sister of ████'s friend, dated, provided by ████ regarding potential drugging; text messages dated November 19-20, 2021 between ████ and her mother, ████████, regarding the break up with ██, provided by ████; ████'s medical appointment form, dated January 26, 2022, provided by ██; ██'s written response to the directly related evidence, provided April 28, 2022 and dated May 1, 2022; ████'s written response to the directly related evidence, dated May 5, 2022; and a Student Conduct Incident Report Form, dated November 22, 2021, provided by ██.

On March 31, 2022, the parties were informed of the close of evidence date of April 4, 2022. The parties were given an equal opportunity to inspect and review the evidence obtained as part of the investigation that was directly related to the allegations raised in the formal complaints, including evidence upon which the University did not intend to rely in reaching a determination regarding responsibility and inculpatory and exculpatory evidence whether obtained from a Party or other source. ████ and his advisor received a copy of that evidence on April 18, 2022. ████'s advisor received a copy of that evidence on April 23, 2022. The parties were each given ten days to review the evidence and submit a written response to the evidence ("the Evidence Response Statement"). The parties were then given an extension to the deadline. ████ submitted an Evidence Response Statement on April 28, 2022. ████ submitted an Evidence Response Statement on May 16, 2022.

The investigator then reviewed the Evidence Response Statements and completed the investigative report. The investigator submitted the investigative report fairly summarizing the relevant evidence to the Title IX Coordinator on May 19, 2022. The parties received a copy of the investigative report on May 20, 2022 and were given until May 25, 2022 to submit a written response to the report (the "Written Response Statement"). ████ submitted Written Response Statement on May 25, 2022. ██ did not submit a Written Response Statement.

The Title IX Coordinator compiled the adjudication file, containing the investigative report and attachments, as well as ▮▮▮▮▮'s response to the report, and shared the file with the Title IX Hearing Panel/Sexual Misconduct Panel (the "Panel"). The Panel reviewed the Policy and the adjudication file. A live hearing was held on June 1, 2022. The duration of the hearing was five hours and twenty-eight minutes. Both parties participated in the live hearing and submitted to cross-examination.

The Panel reviewed the adjudication file and the evidence presented at the live hearing. ▮▮ is presumed not responsible until a determination regarding responsibility is made at the conclusion of the complaint resolution process. The Panel used a preponderance of the evidence standard to determine whether there is sufficient evidence to conclude it is more likely than not that ▮▮ violated the Policy.

## II.    Applicable Policy Definitions

### A.    Sexual Assault

LeTourneau's Policy prohibits sexual assault. Sexual assault is defined as "any actual or attempted sexual contact, including contact with any object, with another person without that person's consent." The Policy further defines sexual contact to include "intentional contact by the accused with the victim's private body parts (genital area, anus, groin, inner thigh, buttocks, or breasts), whether clothed or unclothed; touching another with any of these private body parts (genital area, anus, groin, inner thigh, buttocks, or breasts), whether clothed or unclothed; coerced touching by the victim of another's private body parts (genital area, anus, groin, inner thigh, buttocks, or breasts), whether clothed or unclothed; or forcing another to touch oneself with or on any of these body parts." Sexual assault includes, but is not limited to rape (the penetration, no matter how slight, of the vagina or anus with any body part or object, oral penetration by a sex organ of another person, or oral contact with the sex organ of another person, without the consent of the victim), fondling (the touching of the intimate body parts of another person for the purpose of sexual gratification, without the consent of the victim), incest, and statutory rape.

*Consent*

The Policy defines consent as "words or overt actions by a person clearly communicating a freely given present agreement to perform a particular sexual act. Words or overt actions clearly communicate consent when a reasonable person in the circumstances would believe those words or actions indicated a willingness to participate in a mutually agreed-upon sexual activity. Although consent does not need to be verbal, verbal communication is the most reliable form of asking for and obtaining consent. It is the responsibility of the person initiating the specific sexual activity to obtain consent for that activity."

*Incapacitation*

Incapacitation means the physical and/or mental inability to understand the fact, nature, or extent of the sexual situation. Incapacitation may result from mental or physical disability, sleep, unconsciousness, involuntary physical restraint, or from the influence of drugs or alcohol. With

respect to incapacitation due to alcohol or other drug ingestion, incapacitation requires more than being under the influence of alcohol or other drugs; a person is not incapacitated just because they have been drinking or using other drugs. Incapacitation is determined based on the facts and circumstances of the particular situation, looking at whether the individual was able to understand the fact, nature, or extent of the sexual situation; whether the individual was able to communicate decisions regarding consent, nonconsent, or the withdrawal of consent; and whether such condition was known or reasonably known to the accused or a reasonable sober person in the accused's position. Use of drugs or alcohol by the accused is not a defense against allegations of Sexual Misconduct.

*Coercion*

Coercion is conduct or intimidation that compels an individual to engage in sexual contact or sexual activity against the individual's will by: (1) the use of physical force, (2) threats of severely damaging consequences, or (3) pressure that would cause a reasonable person to fear severely damaging consequences. Coercion is more than an effort to persuade or attract another person to engage in sexual activity. Coercive behavior differs from seductive behavior based on the degree and type of pressure someone used to obtain consent from another.

### B.    Title IX Hostile Environment Sexual Harassment

The Policy defines Title IX Sexual Harassment to include Title IX Hostile Environment Harassment that occurs (1) in the University's education program or activity and (2) against a person in the United States. Title IX Hostile Environment Harassment is unwelcome conduct on the basis of sex determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity.

For purposes of the definition of Title IX Hostile Environment Harassment, a reasonable person means a reasonable person in the shoes of the complainant, considering the ages, abilities, and relative positions of authority of the individuals involved in the incident.

Under the Policy, multiple instances of the following conduct, or other unwelcome conduct on the basis of sex, may constitute Title IX Hostile Environment Harassment:

- Unwelcome pressure for a dating, romantic, or intimate relationship
- Unwelcome touching, kissing, hugging, or massaging
- Unwelcome sexual flirtations, attention, advances, and propositions
- Verbal abuse of a sexual nature or obscene language
- Unnecessary references to parts of the body or verbal commentary about an individual's body or appearance
- Remarks about a person's gender or sexual orientation
- Sexual innuendoes or humor
- Obscene gestures or leering
- Sexual graffiti, pictures, or posters
- Sexually explicit profanity
- Bullying (conduct that may be physically threatening, harmful, or humiliating) that is based on sex, including cyber-bullying

- E-mail, texting ("sexting"), or electronic or cyber harassment

The circumstances that may be considered when determining whether conduct was so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity include, but are not limited to:

- The frequency of the conduct;
- The nature and severity of the conduct;
- Whether the conduct was physically threatening;
- The effect of the conduct on the victim's mental or emotional state;
- Whether the conduct was directed at more than one person;
- Whether the conduct arose in the context of other discriminatory conduct;
- Whether the conduct was merely a discourteous, rude, or insensitive statement; and
- Whether the speech or conduct deserves the protection of academic freedom.

The Policy further describes that conduct is unwelcome when the individual did not request or invite it and regarded it as undesirable or offensive. The fact that an individual may have accepted the conduct does not mean that they welcomed it. On the other hand, if an individual actively participates in conduct and gives no indication that they object, then the evidence generally will not support a conclusion that the conduct is unwelcome. That a person welcomes some conduct does not necessarily mean that person welcomes other conduct. Similarly, that a person willingly participates in conduct on one occasion does not necessarily mean that the same conduct is welcome on a subsequent occasion. Whether conduct was unwelcome may be determined based on the context and circumstances of the encounter or incident.

For purposes of Title IX Sexual Harassment, the University's education program or activity includes, at a minimum, all of the operations of the University, including (1) locations on campus or otherwise owned or controlled by the University, such as residence halls and learning spaces, (2) locations, events, or circumstances over which the University exercised substantial control over both the respondent and the context in which the alleged Sexual Misconduct occurred, such as University athletic events and other University-sponsored off-campus activities, and (3) any building owned or controlled by a student organization that is officially recognized by the University.

### C.    Non-Title IX Sexual Harassment

The Policy defines Non-Title IX Sexual Harassment as "unwelcome conduct of a sexual nature or based on sex" including "unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature" when "such conduct has the purpose or effect of substantially and unreasonably interference with an individual's employment or education, or of creating an intimidating, hostile, or offensive employment or educational environment." Examples of Non-Title IX Sexual Harassment may include conduct (1) that may not rise to the level of Title IX Sexual Harassment, described above, (2) that did not occur in the University's education program or activity, but may nevertheless cause or threaten to cause an unacceptable disruption at the University or interfere with an individual's right to a non-discriminatory education or work environment, or (3) that did not occur against a person in the United States.

The analysis of whether conduct is "unwelcome" for purposes of Non-Title IX Sexual Harassment is the same as for Title IX Sexual Harassment described above.

Under the Policy, Non-Title IX Sexual Harassment does not include conduct covered under the definition of Title IX Sexual Harassment. In other words, a respondent cannot be found responsible for both Title IX Sexual Harassment and Non-Title IX Sexual Harassment for the same conduct.

### D.     Domestic Violence

The definition of Domestic Violence under the Policy includes, but is not limited to, a felony or misdemeanor crime of violence committed by a current or former intimate partner of the victim. The Policy states that while not exhaustive, the following are examples of conduct that can constitute Domestic Violence: (1) physical harm, bodily injury, assault, or Sexual Assault; or (2) a threat that reasonably places the victim in fear of imminent physical harm, bodily injury, assault, or Sexual Assault.

### E.     Dating Violence

Dating Violence is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim. The existence of such a relationship shall be determined with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

Dating Violence includes, but is not limited to, Sexual Assault, physical harm, bodily injury, or criminal assault, or the threat of such abuse or violence. Dating Violence does not include acts covered under the definition of Domestic Violence.

## III.   **Findings and Rationale**

Pursuant to the Policy, the Panel must determine whether the evidence establishes that it is more likely than not that ▮▮ violated the Policy by engaging in Sexual Assault, Title IX Sexual Harassment, Non-Title IX Sexual Harassment, Domestic Violence, and/or Dating Violence towards ▮▮▮. In accordance with the Policy, a determination that the Policy has been violated will result where a preponderance of the evidence demonstrates that a Policy violation has occurred.

Based on the evidence in the adjudication file, the live hearing, and the 2021-2022 Policy provisions regarding Sexual Assault, Title IX Sexual Harassment, Non-Title IX Sexual Harassment, Domestic Violence, and Dating Violence, the Panel concludes that there is insufficient evidence to determine that it is more likely than not that ▮▮ engaged in Sexual Assault, Title IX Sexual Harassment, Non-Title IX Sexual Harassment, Domestic Violence, and/or Dating Violence, as explained below.

### A.     **Brief Background on ▮▮▮ and ▮▮'s Relationship**

At the time the alleged conduct occurred, ▮▮▮ and ▮▮ were both seniors at LeTourneau. The parties agree that they knew of one another since their freshman year but were formally

introduced by mutual friends in October 2021. They also agree that they started dating in late October 2021 and broke up in November 2021.

**B.      Analysis of ███████'s Allegations**

The Panel must determine whether it is more likely than not that ███ engaged in (1) Sexual Assault; (2) Domestic Violence or Dating Violence; and/or (3) Title IX Sexual Harassment or Non-Title IX Sexual Harassment, as defined by the Policy.

**(1)      Sexual Assault**

The Panel first considers whether ███ engaged in Sexual Assault against ███████ in violation of the Policy. ███████ alleges that ███ engaged in Sexual Assault by grinding on ███████ and thrusting into ███████'s genital region without her consent, coercing ███████ to touch his penis, touching ███████'s breasts without her consent, kissing ███████'s chest without her consent, pushing up ███████'s pants and kissing ███████'s inner thigh area without her consent, and slapping ███████'s buttocks without her consent. ███████ further alleges that prior to ███ engaging in this conduct, he drugged her, and that as a result she was incapacitated and could not consent to this sexual activity.

(a)      Incapacitation and Coercion

As an initial matter, given ███████'s allegations that she was incapacitated as a result of ███ having drugged her, before determining what conduct occurred and whether the conduct was consensual, the Panel first analyzes whether ███████ was incapacitated. ███████ also alleges that she was coerced by ███. Therefore, before determining what conduct occurred and whether the conduct was consensual, the Panel also analyzes whether ███████ was coerced.

*Allegations of Drugging*

███████ alleges that she was incapacitated due to ███ drugging her throughout the period of time the alleged Policy violations occurred. Specifically, ███████ stated that on the night of October 30, 2021, she and ███ attended a friend's Halloween party. ███████ stated that, after the party, they returned to ███'s apartment and "made out." ███████ stated that she believes ███ started to "drug" her that night. ███████ stated that, after they kissed for a period of time, ███ provided her with a glass of cold water and that afterwards she started to feel "very loopy, happy, sleepy, can't hold myself up." When told of ███████'s allegation that he drugged her, ███ stated, "I wouldn't even know how to drug somebody if I wanted to. So, I don't know what to say, other than I didn't drug her."

███████ stated that, following October 30, 2021, ███ continued to "drug" her through her drinking water. When asked how often she believes ███ drugged her, ███████ stated, "Almost every night." When asked to further explain, ███████ stated that, except for two to five nights, she spent every evening with ███ at his apartment between October 31 and November 17. ███████ stated that she believes ███ drugged her every night that she was with him at his apartment. ███████ stated that, typically, ███ would invite her over to his apartment. ███████ stated that, once there, ███ would offer her a drink of water or she would request a drink of water, and ███ would leave the room to grab it for her. ███████ stated that, when ███ returned, he would give her a glass of "ice cold water." ███████ stated that this stood out to her because

"our tap water never is icy" and "it can't get that cold." When asked about ████'s statement that the water provided by ██ was different in temperature and taste, ██ stated that the water he provided ████ was from a Brita filter in the fridge in his apartment building.

████ stated that there were times when she would attempt to leave ██'s room and she would "fall to the ground" and ██ would need to "hold [her] up and walk [her] back to [her] apartment." ████ stated that she remembers one occasion where she could not get her key in her door because of how "groggy" she was feeling. When asked if he observed or if ████ expressed to him that she was having difficulty standing or controlling her body, ██ stated, "No. I don't, I don't recall." ██ stated, "████ never seemed off or dizzy or anything like that, because I know that her meds prevented her from being able to drink." When asked about ████'s account that there were times when ████ needed to assist her back to her apartment because she was so weak and that she struggled to put her key in her door, ██ stated, "I don't recall those two instances ever happening."

████ stated that, after she consumed the water provided by ██, they would "continue making out" and would touch one another. ████ stated that this initially involved kissing on top of one another and later turned into ██ "grinding" on top of her. When asked if the effects of the drugging impacted her ability to engage in the kissing or other physical contact with ██, ████ stated, "I felt like most of it, he was doing it to me. And not that I was doing things to him, once things kicked in, I felt I was never grinding on him. It was him doing everything to me."

████ stated that she believes ██ was putting "GHB" or "liquid ecstasy" in her water. When asked why she believes it was GHB or liquid ecstasy, ████ stated that, after she and ██ broke up, she described "a bunch of symptoms" to her friend's sister, who is a paramedic, and the sister shared that she thought it sounded like GHB because GHB is tasteless and odorless. ████ stated that ██ is also "a weightlifter" and that her friend's sister shared with her that weightlifters often use GHB. When asked about ████'s statements that she believes ██ drugged her multiple times during their relationship by putting GHB into her drinking water, ██ said, "No. I don't know what GHB is." ██ stated, "I just gave her a cup of water. I think that I'd just washed it, and there was soap in it. But I never drugged ████."

████ stated that, between October 31 and November 17, 2022, ██ would say and do things to "push" her "boundaries" and "coerce" her while she was drugged. ████ stated, "It just seemed fast, and so it's hard to remember specifically which boundaries got pushed, because it just seemed like everything suddenly was moving." ████ stated that ██ would "start off pretty simple" and asked her "are you comfortable with me holding you and us laying in bed together?" ████ stated that she "normally would not be very comfortable but instead responded that sounds good."

████ stated that on or about November 18, 2021, she shared with her friend ████ about the "happy water," and that ██ told her, "Oh my God. He's been drugging you." ████ stated that ██ then took her to the Emergency Room for a drug test "to see if they could find anything, even though it'd been three days since he last drugged me." ████ stated that the test results came back negative.

*Analysis of ▇▇▇▇'s Allegations of Drugging*

Under the policy, there is a presumption of not responsibility. Therefore, under the preponderance evidence standard, the Panel would need to find sufficient evidence to determine it is more likely than not that ▇▇ drugged ▇▇▇. For the reasons discussed below, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ▇▇ drugged ▇▇. ▇▇▇ has offered no evidence other than her own speculation to support her allegation. ▇▇ denies the allegations and both ▇▇ and ▇▇ provided an alternative and credible explanation for the reason the water was cold – that it was cold because they used a refrigerated Brita filtered water system provided to them by their RA because the tap water came out hot. Importantly, there is no outside evidence in support of ▇▇▇'s allegations. She did not mention to anybody during the three-week period when the alleged drugging occurred that she had concerns about how she was feeling physically, that she was slurring her speech, or that she was unable to walk. The drug test performed on ▇▇▇ was negative. And no evidence of GHB was found in ▇▇'s room when his room was searched after ▇▇▇ reported his alcohol use. Given the presumption of non-responsibility and the lack of evidence to support ▇▇▇'s allegations of drugging, the Panel finds that there is insufficient evidence to find that it is more likely than not that ▇▇ drugged ▇▇.

*Analysis of Whether ▇▇▇ Was Otherwise Incapacitated*

The Panel next considers whether, in light of its finding regarding ▇▇'s alleged drugging of ▇▇▇, ▇▇ was otherwise incapacitated. The Panel finds that there is insufficient evidence to determine that it is more likely than not that ▇▇▇ was incapacitated. Under the policy, incapacitation requires more than being under the influence of alcohol or other drugs; a person is not incapacitated just because they have been drinking or using other drugs. Incapacitation is determined based on the facts and circumstances of the particular situation, looking at whether the individual was able to understand the fact, nature, or extent of the sexual situation; whether the individual was able to communicate decisions regarding consent, nonconsent, or the withdrawal of consent.

During the investigation and hearing, ▇▇▇ was able to remember details from her sexual situations with ▇▇, including communications with ▇▇ during those situations. She described instances of her making decisions regarding consent and nonconsent during those situations. For example, ▇▇▇ stated that ▇▇ offered to show her how to stroke his penis and that she poked his penis, even though she was scared, because she wanted to make him happy. ▇▇▇ also testified that when ▇▇ asked about performing oral sex on her, she told him that she was not comfortable with it, indicating that ▇▇▇ had the capacity to communicate nonconsent. Even by ▇▇▇'s own account, she was able to understand the fact, nature, or extent of the sexual situation, and was able to communicate decisions regarding consent, nonconsent, or the withdrawal of consent. Accordingly, while there were some factors supporting ▇▇▇'s allegation that she was incapacitated, such as her account that she could not walk or hold herself up after drinking water provided by ▇▇, in light of the presumption of nonresponsibility, the Panel concluded that this evidence was insufficient to determine that it was more likely than not that ▇▇▇ was incapacitated during any of the situations where she alleges that ▇▇ engaged in Sexual Assault.

*Allegations of Coercion*

 stated that there were times when she was not drugged that ▮▮ coerced her into engaging in sexual activity. When asked to explain further, ▮▮ stated that ▮▮ only drugged her at night but that there were "a few times" when she visited ▮▮ at his apartment during the day and they would "make out some" and she would touch ▮▮'s penis and engage in choking and pinning. ▮▮ stated, "And so I think he would try to do what we were doing at night. And so I would say I was coerced into doing it, or I was like, I think I've done this before with him. So I would consider that coerced." ▮▮ also testified, "I thought that some of the things we did were consensual because I did not realize I was being coerced into it." ▮▮ further testified, "I didn't realize that it was coercion, and that I didn't really have a choice, and that I was in this trauma bond cycle."

> *Analysis of* ▮▮*'s Allegations of Coercion*

The Panel finds that there is insufficient evidence to conclude that it is more likely than not that ▮▮ coerced ▮▮, as that term is defined in the policy. Under the policy, coercion is defined as conduct or intimidation that compels an individual to engage in sexual contact or sexual activity against the individual's will by: (1) the use of physical force, (2) threats of severely damaging consequences, or (3) pressure that would cause a reasonable person to fear severely damaging consequences. Coercion is more than an effort to persuade or attract another person to engage in sexual activity. Coercive behavior differs from seductive behavior based on the degree and type of pressure someone used to obtain consent from another.

Although ▮▮ alleges that ▮▮ coerced her into engaging in sexual activity, she provides very little detail around when and how he allegedly coerced her. Her allegations are somewhat general and do not include allegations that ▮▮ threatened to use physical force, threatened her with severely damaging consequences, or otherwise pressured her in a way that would cause a reasonable person to fear severely damaging consequences. Although ▮▮ specifically alleges that she was scared to touch ▮▮'s penis and that ▮▮ coerced her to touch his penis, that allegation is inconsistent with ▮▮'s account of her discussion with ▮▮ about touching ▮▮'s penis. Specifically, ▮▮ testified that her conversation with ▮▮ the next day was "quite the opposite" of ▮▮ being fearful. ▮▮ testified that ▮▮ was laughing for most of the conversation. In reaching this conclusion, the Panel did consider ▮▮'s allegation that ▮▮ repeatedly told her to touch his penis and discussed sex even after she said that she did not want to have sexual intercourse. Even if these allegations were true, however, the Panel finds that ▮▮ attempting to persuade ▮▮ to engage in sexual activity would not be sufficient to meet the Policy definition for coercion. Therefore, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ▮▮ coerced ▮▮ into engaging in sexual activity.

> (b)  <u>Grinding and Thrusting</u>

▮▮ stated that ▮▮ would get on top of her and start "grinding" on her while kissing. ▮▮ stated that, after he started grinding on her, ▮▮ would ask "this is okay, right?" ▮▮ stated, "Of course I am going to say yes. I'm numb." ▮▮ further stated that ▮▮ "would choke me, cover my mouth so I can't talk, pin me down very hard and like pull my legs up over him, kind of like, you know, missionary style . . . and thrust into me, hard, into my, my genital region." When asked if she consented to the grinding, ▮▮ stated, "I think I consented to some of the grinding while drugged."

███ stated that the only time he and ███ grinded on one another was when ███ was on top of him. ███ stated, "As far as me being in the missionary position, or on top of her, in any way, grinding on her, that never happened."

███ stated that, on October 30, 2021, she invited ███ and ███ to a Halloween couples party. ███ stated that, after the party, she received a text message from ███ at 3:00 am. ███ stated that ███ was "really excited" because the relationship "had really escalated physically." ███ and ███ had the following exchange:

███ :  Well we got back and made out very aggressively on his bed for 2.5ish hours. And I topped him and he was definitely thrusting/humping into me different times. Again, I have never had anyone say fuck so much. Very fun.

███ :  Also sat on his boner. That was funny.

███ :  Oh oh oh I forgot to mention. He said this was the best kissing he's had/done, ever. EVER. EVERRR. HE SAID IT MULTIPLE TIMES

███ :  How was sitting on his boner funny

███ :  Like it hurt or he was super into it?

███ :  Funny in that I've never done it before and just how turned on he was.

In order to determine whether a Policy violation occurred, the Panel must determine (1) what sexual contact occurred; (2) whether ███ initiated that sexual contact; and (3) if so, whether ███ obtained ███'s consent to engage in that sexual contact.

*Sexual Contact*

The Panel first considers what sexual contact occurred. ███ alleges that ███ "grinded" on her and thrust into her without her consent. ███ alleges that this grinding occurred both while ███ was on top of her and while she was on top of ███. ███ testified that she consented to ███ being on top of her but not to him thrusting into her. ███ stated that any time he and ███ grinded, ███ was on top. ███ further testified that prior to when he and ███ were grinding with her on top, they had a conversation about whether or not she was okay with it. The parties agree that ███ and ███ grinded when ███ was on top, therefore, the panel finds sufficient evidence to conclude that it is more likely than not that such conduct occurred. In light of the differences between the parties' accounts regarding whether they grinded with ███ on top, the Panel looks to outside evidence to determine whether that conduct occurred. The text messages between ███ and ███ describe ███ being on top of ███, but there are no messages describing ███ being on top of ███. Further, ███ testified that ███ never mentioned ███ being on top of her thrusting and grinding. In light of the presumption of nonresponsibility and the lack of evidence in support of ███'s allegation

that they grinded when ▮ was on top, the Panel finds insufficient evidence to determine that it is more likely than not that ▮ and ▮ grinded while ▮ was on top of ▮.

*Consent*

The Panel next considers whether ▮ consented to ▮ grinding when ▮ was on top. ▮ alleges that she did not consent to this conduct. She does, however, acknowledge that she told ▮ that she had fun grinding on him, but says that she was drugged at the time she made the statement.[1] ▮ stated that prior to the grinding, they discussed it and ▮ said she was okay with it. Given the differences in the parties' accounts, the Panel looks to outside evidence. ▮'s allegation that ▮ thrusted and grinded into her without her consent is inconsistent with text messages that she sent to ▮ in which she told ▮ that she "topped" ▮ and that it was "very fun," and that she sat on ▮'s erect penis and that it was "funny." In light of the presumption of non-responsibility and the evidence discussed above, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ▮ grinded on ▮ without her consent.

    (c)   Touching ▮'s Penis

▮ stated that after things started off "pretty simple" with ▮, "it just led very quickly into do you want to grab my dick? You can. You can. It's not even if you want to. It's just you can grab my dick and that was fast." When asked how she responded to ▮'s statements about touching his penis, ▮ stated that she told him, "I don't want to. I'm scared." ▮ stated that ▮ responded "it's okay. You don't have to" but then continued to bring it back up. ▮ stated that ▮ repeatedly told her "to touch it, or grab it. And so like, eventually I would like grab it, hold it through his pants or whatever." ▮ stated, "I'd say I'm not comfortable but he'd keep bringing it up and would never stop and, of course, when I'm drugged on this, whatever this is, this GHB, I eventually was saying like, I guess like we, we can try it." ▮ stated that she expressed to ▮ that she was "incredibly inexperienced" sexually and told ▮ she "[didn't] know what to do with [his penis]" so he started telling [her] like you stroke it, you do this. This is how you do it. Basically, let me know show you how to do it, let me show you how this works." When asked how she responded to ▮'s offer, ▮ stated, "I was really scared, but I also really wanted to make him happy, which sounds stupid right now. But I poked it, and that's about as far as I got was I poked it."

▮ stated that, at some point in the following days after she first "poked" ▮'s penis, she agreed to ▮'s offer to "guide [her] to where [his penis] was, which he did . . . a few times." When asked if, at the time of the alleged conduct, ▮ to touching ▮'s penis while drugged, ▮ stated, "Yes." ▮ further stated, "It wasn't free consent because I was drugged and I was saying just whatever when I was drugged." When asked if she consented to the touching of ▮'s penis when she was not "drugged" by ▮, ▮ stated:

    I don't know. I'm not sure, because in my mind, I had thought everything we did was consensual, but I don't know if it counts as consensual if I keep being coerced into it, like gradually everything I was comfortable with and uncomfortable with was kind of just

---

[1] As noted ab▮e Panel found that there was insufficient evidence to determine that it was more likely than not that ▮ was drugged.

blown out of the waters. So I don't know technically if that would be considered consensual. In my mind, I thought it was, but I also didn't realize I was gradually being upped into doing more and touching more and being okay with things I would never ever in my life have thought of doing.

When asked if the drugging impacted her ability to have these conversations with ██ about touching his penis, ██ stated, "I remember feeling very out of it. I honestly just didn't feel really into it. I was wishing that, like I was doing things, but it was hard for me to communicate." ██ stated that she recalls trying to talk to ██ but her words being slurred. ██ stated, "I couldn't make sense."

██ stated that ██ "touched [his] genitals over [his] pants" on two occasions. When asked if he recalls placing ██'s hand on his genitals, ██ stated, "I don't remember me making her grab it" and said, "I don't remember that happening, her stroking my penis. I just remember her grabbing it. I don't remember any motion or anything like that, or me asking for it." ██ stated, "And I asked her if she was comfortable with doing so and she said yes." When asked if ██ expressed discomfort with the idea of touching his genitals, ██ stated, "No. She didn't."

██ stated that ██ reached out to her about touching ██'s penis. ██ stated, "We talked for a long time about this. But she didn't take his pants off, but she stuck her hand down there and grabbed him. Then we had this big debate about if that was a hand job or not if his pants weren't down." When asked about this part of ██'s account, ██ stated, "I called her specifically because I was so scared and because I had touched his penis and I told her what he was telling me to do. And she's like, oh my gosh, ██, that's a hand job. Like, what are you doing? And so I was like, oh my gosh, that's what that is? So I was very scared."

*Sexual Contact*

The Panel first considers what sexual contact occurred. Both ██ and ██ agree that ██ touched ██'s penis over his pants, not under his pants. Therefore, the Panel finds that there is sufficient evidence to determine that it is more likely than not that ██ touched ██'s penis, which ██ described as a "poke," over his clothing.

██ stated that a few days after she first "poked" ██'s penis, she agreed to ██'s offer to guide her to where his penis was. ██ further stated that ██ instructed ██ on how to "stroke" his penis and that he placed her hand on his penis. ██ testified that he never instructed ██ to touch his penis or placed ██'s hand on his penis. Because of the differences between the parties' accounts, the Panel looks to outside evidence. There is no outside evidence to support ██'s allegations that ██ instructed ██ on how to stroke his penis and placed her hand on his penis. Although ██ alleges that she told ██ that, ██'s account of her conversation does not include those details. Therefore, in light of the presumption of non-responsibility, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ██ instructed ██ to put her hand on his penis or placed her hand on his penis.

*Initiation*

The Panel next considers whether ███ initiated the touching of his penis by ████. ████ stated that ███ repeatedly told her to grab his penis. ████ stated that he told ████ that if she wanted to touch his penis, it was okay with him. Therefore, the parties agree that ███ brought up the topic of ████ touching ███'s penis. The Panel finds that ████ initiated the touching of his penis when he told ████ that she could touch his penis. Therefore, the Panel finds that there is sufficient evidence to determine that it is more likely than not that ███ initiated the contact.

*Consent*

The Panel next considers whether ████ consented to touching ███'s penis. ████ alleges that she did not have capacity to consent to touching ███'s penis because she was drugged by ███. However, for the reasons outlined above, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ████ was drugged. Therefore, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ████ lacked capacity to consent to touching ███'s penis.

With regard to whether ████ consented to touching ███'s penis, the Panel finds that there is insufficient evidence to determine whether it is more likely than not that this contact occurred without ████'s consent. ████ stated that after ███ made the comment about touching his penis, she touched or "poked" ███'s penis. The Panel considers ████'s touching of ███'s penis to be an overt action indicating agreement to touch his penis. Although ████ alleges that she was coerced into touching ███'s penis, for the reasons discussed above, the Panel finds that there is insufficient evidence to find that ███ more likely than not coerced ████ to touch his penis. Therefore, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ████ did not consent to touching ███'s penis.

(d)    Touching ████'s Breasts

████ stated that ███ "grabb[ed] [her] breasts" after she removed her shirt. When asked if, she indicated through words or actions that she consented to ███'s touching of her breasts, ████ stated, "Yes. While drugged." When asked if ███ touched her breasts when she was not drugged, ████ stated, "I don't remember." ████ stated that when he touched ████'s breasts she was always wearing a bra and he touched her breasts over her bra.

*Sexual Contact*

The Panel first considers what sexual contact occurred. ████ alleges that ███ touched her breast when her shirt was off, and ███ states that ████ always had at least a bra on. The Panel finds that these accounts are both consistent with ███ touching ████'s breast, that the parties agree that this conduct by ███ occurred, and that there is no evidence that calls into question the accounts of the parties. Therefore, the Panel finds that there is sufficient evidence to determine that it is more likely than not that ███ touched ████'s breast.

*Initiation*

The Panel next considers whether ████ initiated touching ████'s breast. ████ stated that ███ initiated this contact. ████ stated that he touched ████'s breast. Therefore, the Panel finds that there is sufficient evidence to determine that it is more likely than not that ███ initiated contact with ████'s breast.

*Consent*

The Panel next considers whether ▮▮ consented to ▮▮ touching her breast. ▮▮ alleges
that she consented to ▮▮ touching her breast one time but not other times that this contact
occurred. ▮▮ testified that she was unable to indicate consent to ▮▮ touching her breast
because ▮▮ covered up her mouth so that she could not speak or talk. ▮▮ testified that he
remembered asking ▮▮ if she was okay with him grabbing her chest both before and after,
and that she said she was. Because of the differences between the parties' accounts, the Panel
looks to outside evidence. In a November 2 text message, ▮▮ told ▮▮ that ▮▮ had
"grabbed her boob a few times" and that she was "kinda into it." This evidence is not sufficient
to tip the scale towards ▮▮'s account.   Therefore, given the presumption of non-
responsibility, the Panel finds that there is insufficient evidence to determine that it is more likely
than not that ▮▮ touched ▮▮'s breast without her consent.

    (e)   <u>Kissing ▮▮'s Chest</u>

▮▮ stated that ▮▮ kissed her chest and stomach after her shirt was removed. ▮▮ also
stated, "I kissed her on her thighs and her stomach and on her chest. And, I think she had done
the same for me." ▮▮ further stated, "I kissed her on her thighs and her stomach and on her
chest."

    *Sexual Contact*

The Panel first considers what sexual contact occurred. The parties agree that ▮▮ kissed
▮▮'s chest, and there is no evidence that calls into question the accounts of the parties.
Therefore, the Panel finds that there is sufficient evidence to determine that it is more likely than
not that ▮▮ kissed ▮▮'s chest.

    *Initiation*

The Panel next considers whether ▮▮ initiated kissing ▮▮'s chest. The parties both agree
that there was mutual kissing on the chest by both parties, but there is no evidence as to who
initiated that contact. Therefore, the Panel concludes that there is insufficient evidence to
determine that it is more likely than not that ▮▮ initiated kissing ▮▮'s chest.[2]

    (f)   <u>Kissing ▮▮'s Inner Thigh</u>

▮▮ stated, "I think ▮▮ also pushed up my pants, ones that were loose, and was kissing
deep inner thigh area, inner thigh, stomach." When asked if, in the moment, she indicated
through words or actions that she was okay with the kissing, ▮▮ stated, "Pretty sure I was
drugged and I keep saying that, but okay. So I think I acted like I was okay. I was very out of it,
but that's at least what I remember." ▮▮ testified that he asked for ▮▮'s permission to kiss
her inner thigh and that she said that she was okay with it.

    *Sexual Contact*

---

[2] The Panel further finds that regardless of which party initiated kissing of the chest, because the parties mutually
engaged in this conduct with one another, there would be sufficient evidence to determine that it was more likely
than not that this conduct was consensual as to both parties.

The Panel first considers what sexual contact occurred. The parties agree that ██ kissed ██████'s inner thigh, and there is no evidence that calls into question the accounts of the parties. Therefore, the Panel finds that there is sufficient evidence to determine that it is more likely than not that ██ kissed ██████'s inner thigh.

*Initiation*

The Panel next considers whether ██ initiated kissing ████'s inner thigh. ██ testified that he asked ██████ for permission before kissing her inner thigh. Therefore, the Panel finds that there is sufficient evidence to determine that it is more likely than not that ██ initiated this contact.

*Consent*

The Panel next considers whether █████ consented to ████ kissing her inner thigh. ██████ alleges that she was "pretty sure" she was drugged when ██ pushed her pants up and kissed her inner thigh. However, for the reasons outlined above, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ██████ was drugged. Therefore, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ██████ lacked capacity to consent to ████ kissing her inner thigh.

██████ testified that she did not verbally consent to ████ kissing her inner thigh. ██████ further testified that she may have moved ████'s head away but that he continued kissing her thigh. ██ testified that ██████ gave him permission to kiss her inner thigh, and that he did not recall her moving his head away. In light of the presumption of non-responsibility and the lack of outside evidence on this issue, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ████ kissed ██████'s inner thigh without her consent.

(g)    Slapping ██████'s Buttocks

██████ stated that ████ "slapped [her] butt very, very, very hard" on at least 15 occasions. ██ testified that ████ never asked for permission before slapping her butt. ██ stated that he recalled slapping ██████'s butt. When asked if ██████ expressed, through words or actions that she consented to the slapping of her butt, ██ stated, "Yeah. All that was stuff that was consensual and communicated beforehand and afterwards."

*Sexual Contact*

The Panel first considers what sexual contact occurred. Both parties agree that ████ slapped ██████'s buttocks, and there is no evidence that calls into question the accounts of the parties. Therefore, the Panel finds that there is sufficient evidence to determine that it is more likely than not that ██ slapped ██████'s buttocks.

*Initiation*

The Panel next considers whether ██ initiated slapping ██████'s buttocks. The Panel finds that there is sufficient evidence to determine that it is more likely than not that ██ initiated this contact.

*Consent*

The Panel next considers whether ██████ consented to ████ slapping her buttocks. ██████ alleges that she did not have capacity to consent to ████ slapping her buttocks because she was drugged by ████. For the reasons outlined above, the Panel finds that there is insufficient evidence to determine that it is more likely than not the ██████ was drugged. Therefore, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ██████ lacked the capacity to consent to ████ slapping her buttocks.

In light of the presumption of non-responsibility, the parties' differing accounts and the lack of external evidence on this issue, the Panel finds that it there is insufficient evidence to determine that it is more likely than not that ████ slapped ██████'s buttocks without her consent.

### (2)  Title IX Sexual Harassment, Non-Title IX Sexual Harassment, Domestic Violence, or Dating Violence

The Panel next considers whether ████ engaged in Title IX Sexual Harassment, Non-Title IX Sexual Harassment, Domestic Violence, or Dating Violence against ██████ in violation of the Policy. Because the same alleged conduct forms the basis for the allegations of Title IX Hostile Environment Harassment, Non-Title IX Sexual Harassment, Domestic Violence, and Dating Violence, the Panel must first determine what conduct occurred before determining whether any conduct found to have been engaged in by ████ constituted a violation of the Policy.

### (a)   What Conduct Occurred

██████ stated that, towards the end of October, she and ████ started spending time together nearly every night at ████'s apartment. ██████ stated that, early on, she and ████ discussed their "comfort[ability]" with "physical affection." ██████ stated that she considers physical affection her "number one love language" but that ████ "didn't seem super comfortable with affection." ████ stated that early on in the relationship, "██████ took the lead when it came to physical affection, sitting next to her or cuddling or holding hands or kissing, because it was something that she had more experience with just because she's dated more people than I have." ████ stated that, while spending time together, he initiated conversations about what they were comfortable with doing sexually. ████ stated, "In the beginning of the relationship, it was like, do you want to sit next to me? Do you want to kiss? Do you want to cuddle? Would you like to hold my hand?" ████ stated that this later turned into "are you comfortable with doing this? Or do you want to do this?"

██████ stated that, in these early conversations, she "set the boundary" with ████ with regard to sexual intercourse. ██████ stated that she told ████ that they were "never having sex" and that she was "not okay with" having sex. ██████ further stated that even after she told ████ that she did not want to have sex, ████ continued to bring up the topic in later conversations. ████ stated that ██████ told him early on in the relationship that she did not want to have sex before marriage. When asked how he responded to ██████'s statement, ████ stated, "I remember telling her that's completely fine, and I completely understand." ████ stated that, towards the end of their relationship, "I remember one time specifically where she told me I've never wanted to have sex with somebody so bad, but I had told ██████ that I didn't want us to have sex and I know that she didn't want us to have sex either." When asked about ████'s statement that he told ██████ that he did not want them to have sex, ██████ stated, "That's baloney. No." When asked about



█████'s statement that she told him she wanted to have sex with him, █████ stated, "I may have said that once potentially."

█████ stated that she had been okay with "light choking," but when she was drugged, █████ engaged in "very, very aggressive choking. Very much like you can't breathe, you can't, can't talk. Nothing can get out." When asked if she recalls how she first reacted to the aggressive choking, █████ stated, "I think I was kind of shocked, but I also felt numb, loopy, happy. So I was like, sure, I'm into it." When asked if she recalls if █████ said anything to her prior to the choking, █████ stated, "I don't know. I'm not sure." When asked if, in the moment, she indicated to █████ that she consented to the aggressive choking, █████ stated, "I may have said something but I don't remember."

█████ testified that █████ covered up her mouth "frequently," and that she was not sure if they had ever had a conversation about █████ covering up her mouth. █████ also testified that "at some points," she and █████ engaged in mutually consensual pinning of each other.

█████ stated that, eventually, the choking and other "violence" just "became a part of making out." When asked if she and █████ ever had discussions about the use of physical force while kissing, █████ stated, "I think after, he asked me what I thought. I was like, it seemed pretty good. I think I'm okay with it, so I think after I was like yeah, it seemed pretty good. It wasn't so severe that afterwards I was injured, if that makes sense." When asked how often the spanking, choking, or pinning occurred, █████ stated, "Very regularly," and "I'd say almost every time, I feel like it picked up of course, into how violent things got so more in the latter half, I'd say of our dating. It was when it was really bad."

█████ stated that in early November, he and █████ were "making out," and he asked her "if she was comfortable with me pulling her hair or choking her, or if she's comfortable doing those things to me." █████ stated that, following that discussion, he and █████ engaged in "mutual" BDSM behaviors. █████ stated that he would "pin" █████, and she would "pin" him, that "there was some biting" and "also choking." █████ testified that there were two or three times when he had his hand over █████'s mouth. █████ stated that, when he brought up the topic of BDSM to █████, he told her about a test online "where you answer questions and you can receive a chart of what your interests might be, what percent you would align with certain aspects of it." █████ stated that he suggested to █████ that she take it. █████ stated that, a few days later, █████ sent him a screen shot of her results for him to review.  When asked if the results prompted any conversations with █████, █████ stated, "It made me, I guess, able to ask more, like if we could do the pinning down and the scratching and stuff that. . . I guess, when you know that somebody's not as vanilla, it makes it more comfortable to talk with them about stuff that's not vanilla."

█████ stated that both he and █████ "inflicted and received," and that "[i]t was consensual obviously, because one of the cornerstones and the capstone of a BDSM type relationship is consent. It's the most important part of it." When asked if █████ ever expressed hesitancy to certain BDSM activities, █████ stated, "No, because if there was any time where she had expressed discomfort or if she was unsure, I would've stopped." When asked if █████ ever expressed that things had gotten too rough or that she wanted to slow down, █████ stated, "No. She never voiced that or expressed that to me at all." █████ further stated, "I would never choke her to the point

where she was unable to breathe. We would discuss those things beforehand, and I would make sure that she was okay with them afterwards." ███ further stated, "We would revisit those conversations, like I said, in a non-sexual context. So even if, for the sake of the argument, I did drug ███, we would have conversations about the stuff that we did, and were doing, outside of the bedroom. So she would be able to tell me no, I wasn't comfortable with that or yes, I was comfortable with that. And I was never told no, I was uncomfortable with that. So I assumed that what we're doing was okay." ███ further stated, "Also, we did have a safe word. That's really important to, I guess, like aggressive sexual interaction." ███ testified that on the occasions when his hand was over ███'s mouth, they agreed to use a safe signal instead of a safe word.

███ stated that ███ had talked to her "for the whole time we had known each other about wanting to do BDSM stuff, both in her previous relationship, and then she wanted to hear about stuff I had done and said she was into it." ███ stated that ███ had talked to her about "being tied up and pinning and gagging and stuff, and hair pulling and choking." ███ stated that ███ told her that she and ███ "choked each other and he taught her how to do it because there's a wrong way to do it where you could get hurt and there's a safe way to do it. There might have been spanking and definitely pinning." When asked if ███ expressed hesitation or discomfort with those acts, ███ stated, "No." Moreover, in a text message to ███, ███ wrote, "███ everyone in our generation chokes," and ███ replied "Really!?" and "Good good good." In another text message to ███, ███ wrote, "Idk if full bondage is typical but choking is pretty basic apparently," and ███ replied, "Good."

███ stated that ███ also started "making like punches at [her]." When asked to further explain, ███ stated that ███ sent her a TikTok video of a man welcoming a woman into his room. ███ stated that, after the woman laid down, the man would start "pummeling her head." ███ stated that when she asked ███ if that is what he wanted to do to her, "keep joking about it and would keep like, faking the movements" of punching her while laughing. When asked how she responded to the video, ███ stated that she would ask ███ why he was sending the video to her, but he would not respond. When asked if she asked ███ what he was trying to imply by sending or quoting the video, ███ stated that ███ told her that he thought it was funny and that she responded, "It's not funny." ███ stated, "I felt really scared after that, whenever he would start swinging at me, because I knew just in my gut. I'm like, he wants to beat me, especially with how he was already kind of pulling me around and slapping my butt really hard." When asked what led her to believe ███ wanted to hit her, ███ stated, "When he started slapping me really hard on the butt, I just really felt the vibe. I was like, he really wants to hit me."

When asked if he recalls sharing a TikTok video with ███ which showed a man punching a woman in the face, ███ stated, "I vaguely remember that video . . . but it wasn't aggressive. It was more of a, I forget the joke, but . . . the context is not meant to be violent. It's meant to be humorous." When asked if he attempted to reenact the video with ███, ███ said, "Yeah" and stated, "It was more of a play comical punch. And I wouldn't, I wouldn't hurt her at all. It was more me touching her with my fist and making sound effects, as a joke."

███ stated that in early November, ███ also attempted to push her boundaries by suggesting "different things that [they] could do or that he could try on [her]." ███ stated that ███ brought up the idea of him performing oral sex on ███. ███ stated, "I was like super in the mood that day. I don't think I was drugged, but I had some little bit of clarity." ███ stated

that after ██ brought up the idea of him performing oral sex on her, she told ██ she wanted to think about it and that the next time she saw him she told him, "That's sex. I consider that sex, and I'm telling you again, if I ever say that I consent while we're doing something, I do not consent. I have to be completely sober . . . I have to be completely in my right mind. I am not allowed to be making out with you and suddenly change it." When asked if the topic of oral sex was brought up again after this initial discussion, ██ stated, "That was the only time he brought it up."

██ stated that on one occasion, he asked ██, "How would you feel about me eating you out?" and ██ told him "I don't really know how I feel about that." ██ stated that he told ██, "We can come back to it or just not do it," and there was no further discussion about it. When asked about ██'s statement that they later discussed the idea of oral sex and that ██ shared with him that she believed oral sex to be sex and that she did not want to engage in oral sex, ██ stated, "Okay. Yeah. I remember that conversation."

██ stated that, in mid-November, ██ reached out to her and asked if letting ██ perform oral sex on her would constitute intercourse. ██ stated that ██ told her "about how ██ wasn't pressuring her, that he really wanted her to take time to think about it and they had talked about it and then adjourned to think about it, and were going to come back together." In a text message exchange with ██ regarding ██'s request to perform oral sex on ██, ██ wrote, "[H]e wasn't pressuring me into it."

When asked about ██'s account that ██ had told her that ██ was respectful of her boundaries, ██ stated, "I think at the time again, that's what I sincerely thought. I sincerely thought that he was respecting my boundaries. I thought he was open and kind and honest. And it wasn't until I realized afterwards that he was coercing me and drugging me that all of that was fake. So yes, I think I expressed that to her, but I realize now I was very wrong."

██ also stated that ██ repeatedly told her to grab his penis. She testified that ██ did this "five plus times," and that every time it happened, she would say that she was scared. ██ further testified that ██ would say "that's okay," but would then continue to ask the next day. ██ stated that he remembered "a couple of conversations" where he asked if ██ was comfortable touching his penis.

██ also stated, and ██ agreed, that ██ kissed ██ on the stomach.

Based on the parties' accounts, ██'s account, and the evidence, the Panel finds sufficient evidence to determine that it is more likely than not that the following conduct occurred:

- ██ asked ██ if she was comfortable with him holding her and with them lying in bed together;

- ██ kissed ██'s stomach;

- In early November, ██ suggested performing oral sex on ██;

- ██ "choked" ██████;[3]

- ██ covered ██████'s mouth so that she could not talk;

- ██ pinned ██████ down and pulled her legs up over him; and

- ██ made punching motions at ██████.

Regarding the allegation that ██ repeatedly told ██████ to grab his penis, ██ stated that he told ██████ it was okay with him if she wanted to touch his penis, but denies that he *told* her to touch his penis. There is no external evidence as to whether ██ *told* ██████ to touch his penis or whether he said it was okay if she touched his penis. In light of the presumption of nonresponsibility, the Panel finds insufficient evidence to determine that it is more likely than not that ██ repeatedly told ██████ to grab his penis.

    (b)   <u>Title IX Sexual Harassment</u>

Having determined what conduct occurred, the Panel next considers whether ██ engaged in Title IX Sexual Harassment against ██████ in violation of the Policy. Under the Policy, the Panel must determine (1) whether the conduct occurred in LeTourneau's education program or activity and against a person in the United States; (2) whether the conduct that occurred was on the basis of sex; (3) whether the conduct was unwelcome; and (4) whether a reasonable person would determine that the conduct was so severe, pervasive, and objectively offensive that it effectively denies a person equal access to LeTourneau's education program or activity.

    *Education Program or Activity/Against a Person in the United States*

The Panel first considers whether ██'s conduct occurred (1) in the University's education program or activity and (2) against a person in the United States. Because all of the alleged conduct occurred between two students attending the University, in the United States, on campus in a dorm room, this threshold inquiry is met.

    *On the Basis of Sex*

The Panel next considers whether the conduct that occurred was on the basis of sex. The phrase "on the basis of sex" includes conduct that is sexual in nature. Additionally, under the Policy, examples of conduct that may constitute Title IX Sexual Harassment and is therefore on the basis of sex include unwelcome pressure for a dating, romantic, or intimate relationship; and unwelcome touching, kissing, hugging, or massaging; and unwelcome sexual flirtations, attention, advances, and propositions.

The Panel finds that the following conduct was sexual in nature and resembles the examples of Title IX Sexual Harassment listed in the Policy:

---

[3] In reaching this conclusion, the Panel finds that both parties agree that some form of choking occurred, but disagree as to the intensity or severity of that choking. The Panel therefore concludes that there is sufficient evidence to determine that it is more likely than not that some form of choking motion, which both parties refer to as "choking," occurred.



- ██ asked ██ if she was comfortable with him holding her and with them lying in bed together;

- ██ kissed ████'s stomach;

- In early November, ██ suggested performing oral sex on ████;

- ██ choked ██;

- ██ covered ████'s mouth so that she could not talk;

- ██ pinned ████ down and pulled her legs up over him

Therefore, the Panel finds sufficient evidence to determine that is it more likely than not that this conduct was on the basis of sex.[4]

*Unwelcome*

The Panel next considers whether the conduct that occurred was unwelcome. ████ contends that all of the conduct on the basis of sex that was found to have occurred was unwelcome. ██ testified that ████ never communicated that any of the conduct or conversations that she had with ██ were unwelcome and that ████ mutually engaged in these types of activities. Given the differences in the parties' account, the Panel looks to outside evidence. The Panel finds ████'s allegation that the conduct was unwelcome to be inconsistent with other accounts and evidence considered. Specifically, ████'s conversations with ████, including the conversations in text messages that were part of the investigation file, indicate that ████ was willingly engaging in the conduct and enjoying the conduct (such as when she described it as "really hot" and "fantastic"). ████ also set clear boundaries with ██, such having a safe word and safe signal, and there is no evidence that ██ ever ignored those boundaries. In addition, ██ admits to having herself engaged in this conduct. For these reasons, the Panel finds that there is insufficient evidence to conclude that it is more likely than not that this conduct was unwelcome.

Because the Panel finds that there is insufficient evidence to conclude that it is more likely than not that all of ██'s conduct on the basis of sex was unwelcome, the Panel finds insufficient evidence to determine that is it more likely than not that any of the conduct alleged constituted Title IX Sexual Harassment.

(c)    <u>Non-Title IX Sexual Harassment</u>

As a threshold matter, in order for conduct to constitute Non-Title IX Sexual Harassment under the Policy, the conduct must be unwelcome conduct of a sexual nature or based on sex. Because the Panel determined that there is insufficient evidence to determine that it is more likely than

---

[4] In reaching its conclusion that ██'s pretend punching was not sexual in nature, the Panel considered both ██'s account and ██'s account of the fake punches, the TikTok video that ████ indicated was connected to ██'s fake punching conduct, and the examples of Title IX Sexual Harassment listed in the Policy. Based on this evidence, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ██'s pretend punching motions were sexual in nature.

not that ███'s conduct on the basis of sex was unwelcome, the Panel need not analyze whether ███ engaged in Non-Title IX Sexual Harassment.

(d)    <u>Domestic Violence or Dating Violence</u>

███ alleged that ███ engaged in Domestic Violence or Dating Violence by choking ███, covering her mouth so that she could not talk, pinning her down, and making punching motions at her. The Policy states that Dating Violence does not include acts covered under the definition of Domestic Violence. Under the Policy, the primary difference between Domestic Violence and Dating Violence is the type of relationship between the parties.  Therefore, as a threshold matter, the Panel must determine whether ███ and ███ were in a domestic relationship, a dating relationship, or neither.  The Panel first looks to whether the parties were in a domestic relationship. Under the Policy, the relationships that qualify a crime as domestic violence include current or former intimate partners.  The parties agree that they were in an intimate relationship with one another.  Therefore, the Panel finds that there is sufficient evidence to determine that it is more likely than not that the parties were in a qualifying domestic relationship under the Policy and, as such, the Panel analyzes ███'s allegations under the definition of Domestic Violence, rather than Dating Violence.

Having determined that the parties were in a domestic relationship, the Panel must next determine (1) what conduct occurred; and (2) whether that conduct constituted a felony or misdemeanor crime of violence against ███.  As discussed above, the Panel found sufficient evidence to determine that it was more likely than not that the following conduct occurred:

- ███ asked ███ if she was comfortable with him holding her and with them lying in bed together;
- ███ kissed ███'s stomach;
- In early November, ███ suggested performing oral sex on ███;
- ███ choked ███;
- ███ covered ███'s mouth so that she could not talk;
- ███ pinned ███ down and pulled her legs up over him; and
- ███ made punching motions at ███.

*Felony or Misdemeanor Crime of Violence*

The Panel next considers whether ███ engaged in a felony or misdemeanor crime of violence against ███.  Under the Policy, examples of conduct that can constitute Domestic Violence include: (1) physical harm, bodily injury, assault, or Sexual Assault; or (2) a threat that reasonably places the victim in fear of imminent physical harm, bodily injury, assault, or Sexual Assault.

The Panel finds that there is insufficient evidence to determine that it is more likely than not that ███ engaged in a felony or misdemeanor crime of violence. ███ alleges that ███ was starting to "physically abuse" her when he began slapping her on the buttocks very hard.[5] ███ testified that she suffered hickeys from sexual encounters with ███, and that she was "in

---

[5] As part of its analysis of whether ███ engaged in Sexual Assault, the Panel determined that there was sufficient evidence to determine that it was more likely than not that ███ slapped ███'s buttocks.

pain," but that there were not any "visible large bruises." ██████ alleges that she became fearful of ██ physically harming her when he sent the TikTok video of a man appearing to punch a woman, and when he started making punching motions at her. ██████ also alleges that ████ choked her very aggressively to the point where she could not breathe.

████ testified that he never physically harmed or injured ██████ in any way during their sexual encounters, and that he never threated to harm her. ████ further testified that he thought the TikTok video was satirical and did not think it would be misinterpreted as anything harmful. He also stated that ██████ never communicated that she was afraid of him. ████ also stated that he never choked ████ to the point where she could not breathe.

First, with regard to ██████'s allegation regarding ████ slapping her buttocks, ██████ indicated that she was not injured or bruised by this conduct, and ████ testified that he never injured ██████. Accordingly, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ████ slapping ██████'s buttocks constituted a felony or misdemeanor crime of violence against ████.

Next, with regard to ██████'s allegation regarding being fearful of ████ when he started making punching motions at her after sending the TikTok video, the Panel looks to outside evidence in light of the parties' differing accounts. When asked if ██████ had ever expressed to her that she was fearful of ████, ████ testified that ██████ told her that she had "never felt safer" in a relationship. Accordingly, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ████ making punching motions at ██████ constituted a felony or misdemeanor crime of violence against ████.

Lastly, with regard to ██████'s allegations regarding choking, given the parties' differing accounts, the Panel looks to outside evidence. In a text message that ██████ sent to ██████, ██████ discussed ████'s comment that choking just right takes practice. This message supports ██████'s account that he and ██████ discussed safe ways to choke so as to make sure of that. ██████ also sent messages to ██████ stating that she would be "into getting tied up potentially" and that the "kinkiest" thing that she had imagined doing with ████ was "tying up or choking." The Panel further considered that ██████ and ████ both agreed that they discussed safe words, and discussed extensively what they were comfortable doing. These actions are not consistent with causing physical harm or injury or a threat that reasonably places the victim in fear of imminent physical harm.

In light of the presumption of non-responsibility and the evidence discussed above, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ████ engaged in Domestic Violence.

## IV.    **Conclusion**

Based on the Panel's review of the adjudication file and the evidence presented at the live hearing and for the reasons discussed above, the Panel finds that there is insufficient evidence to determine that it is more likely than not that ████ engaged in Sexual Assault, Title IX Sexual Harassment, Non-Title IX Sexual Harassment, Domestic Violence, or Dating Violence, as defined by the Policy, toward ██████. Accordingly, the Panel finds that there is insufficient evidence that a Policy violation by ████ occurred.

Even though the Panel has determined that there is insufficient evidence to establish that it is more likely than not that a Policy violation occurred, the mutual no contact directive between ████ and ██ will continue in effect until otherwise terminated by LeTourneau. This mutual no contact directive includes these items:

- ████████ and ██████ are to have no direct or indirect contact by any means. This means that ██████ and █ may not directly contact each other or contact each other through a third party. This restriction on contact includes in-person, verbal, written, oral, physical, email, phone, text message, all types of electronic contact (including social media), and non-verbal contact (including eye contact, gestures, and staring), as well as contact initiated by others on ██████'s or ███'s behalf.

- In all public spaces, ██████ and ███ must make all reasonable efforts to remain at least 25 feet from each other and shall not have verbal or non-verbal contact. In classrooms, hallways, sidewalks, and other small venues where it is not possible to maintain the 25-foot separation, ██████ and ███ will remain as far from each other as possible, avoid eye contact, and shall not have any verbal or non-verbal contact. In addition, please note that this extends to off-campus spaces such as off-campus housing, coffee shops, etc. If you do encounter each other in these off-campus public settings, the expectation is that you will comply with the requirements of this Mutual No Contact Directive. As a general rule, in regard to public spaces, the person who arrives second is responsible for either (1) leaving the space or (2) placing himself or herself at a distance from the other person that allows each person to use the space without contact. This applies to spaces both on-campus and off-campus. We expect each party to utilize good judgment when in public spaces and when making the determination about whether there is enough space to put necessary distance between the parties.

To the extent that questions arise regarding implementation of the ongoing mutual no contact directive, those matters will be resolved at the discretion of the Title IX Coordinator and such decisions will not be appealable.

## V.    <u>Right to Appeal</u>

Following receipt of this determination, either party may appeal the Panel's decision regarding responsibility. The appeal section of the Policy, including additional information regarding submitting an appeal, is included below. In this case, the deadline for submitting an appeal is July 2, 2022.

<u>Appeal</u>

Either the complainant or the respondent may appeal a decision to dismiss a formal complaint or any allegations therein, as discuss above in the section VII(F)(6) Dismissal of Formal Complaint Prior to Adjudication. The parties may also appeal the Title IX Hearing Panel's/Sexual Misconduct Panel's decision regarding responsibility. An appeal may be made exclusively on one or more of the following grounds:

- Procedural irregularity that affected the outcome of the matter;
- New evidence that was not reasonably available at the time of the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter;
- The Title IX Coordinator, investigator, or Title IX Hearing Panel/adjudicator(s) had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that affected the outcome of the matter;
- The sanctions imposed or other response by the University are not appropriate to the findings.

a. Submitting an Appeal

The parties may request an appeal by submitting a written appeal statement, which may not exceed 2,500 words in length, challenging the outcome of the complaint resolution process. The written appeal statement must be submitted to the Title IX Coordinator within two (2) calendar days after the date the notice of outcome was sent to the complainant and respondent and must explain the grounds for the appeal. While the parties may be assisted by their advisors in preparation of the appeal statement, the appeal statement must be submitted by the party, must be the party's own statement, and may not be used to submit the statements of others on the party's behalf. Failure to file a timely appeal constitutes a waiver of any right to an appeal.

The Title IX Coordinator will review the appeal statement. If the appeal statement states a permissible ground for appeal as listed above, the Title IX Coordinator will continue the appeals process. The Title IX Coordinator may remove or redact any portions of the appeal statement that exceed the word limit or that otherwise exceed the scope of information that may be considered in the complaint resolution proceeding (such as treatment records without consent, information subject to a legal privilege without a waiver, or evidence relating to the complainant's prior sexual history if an exception does not apply).

The non-appealing party will be notified of the appeal and provided an opportunity to review the appeal statement and submit a written response in support of the outcome. Any written response from the non-appealing party in support of the outcome must not exceed 2,500 words and must be submitted to the Title IX Coordinator within two (2) calendar days of receiving notice of the appeal. While the party may be assisted by their advisors in preparation of the responsive appeal statement, the responsive appeal statement must be submitted by the party, must be the party's own statement, and may not be used to submit the statements of others on the party's behalf.

The Title IX Coordinator will review any written response to the appeal and may remove or redact any portions of the statements which exceed the word limit or that otherwise exceed the scope of information which may be considered in the complaint resolution process, such as treatment records without consent, information subject to a legal privilege without a waiver, or evidence relating to the complainant's prior sexual history if an exception does not apply.

The Title IX Coordinator generally will compile an appeal file, which may consist of any information, documents, or other evidence that is provided to the Appeal Official. Such information, may include, the written appeal statement, the written response to the appeal, the written notice of the Title IX Hearing Panel's/Adjudicators' decision, the adjudication file in its entirety or in part, any previously undiscovered evidence (if discovery of new evidence is a ground for the appeal), and any other information determined to be necessary for the Appeal Official's decision at the Title IX Coordinator's discretion.

For complaints involving allegations of (1) Title IX Sexual Harassment or (2) Sexual Assault, Dating Violence, Domestic Violence, or Stalking *occurring outside* of the education program or activity or against a person *outside* of the United States, the appeal file will be made available for review by the complainant and respondent. The Title IX Coordinator will provide a two (2) calendar day period for the complainant and respondent to have access to review the appeal file and such access generally will be provided during normal business hours in a designated on-campus location. The appeal file cannot be removed from that location, nor can copies be made or pictures taken of the contents. The parties (and their advisors) may take personal handwritten notes.

In cases where the appeal file is made available for review as discussed above, the parties and parties' advisors may use the appeal file reviewed at this step and any additional information reviewed during the consideration of the appeal (see below), only for purposes of participating in the complaint resolution process and are prohibited from disseminating or otherwise sharing the appeal file or additional information with any other individual. Prior to being provided access to the appeal file or any additional information, the parties and parties' advisors will be required to sign a non-disclosure agreement agreeing to such terms.

The Title IX Coordinator will assign an Appeal Official to decide the appeal. Generally, the Appeal Official will be a member of the Title IX Team who has not previously been involved in the specific complaint resolution process. The University reserves the right to appoint any trained Appeal Official who is free of conflict of interest or bias. The parties will receive written notice of the Appeal Official appointed. If any party has a concern that the Appeal Official has a conflict of interest or bias, the party should report the concern in writing as indicated in the section IX(I) Conflicts of Interest below.

Consideration of Appeal

The Appeal Official will review the appeal file. The Appeal Official may, in his/her discretion, seek additional information from the Title IX Coordinator, the Investigator, or another appropriate individual. For cases of (1) Title IX Sexual Harassment or (2) Sexual Assault, Dating Violence, Domestic Violence, or Stalking *occurring outside* of the education program or activity or against a person *outside* of the United States, if the Appeal Officials receives any additional information, the parties shall have an opportunity to review the additional information.

The Appeal Official will use a preponderance of the evidence standard to determine whether it is more likely than not that one of the above-listed grounds for appeal have been satisfied. If the Appeal Official determines that there is sufficient evidence to conclude that it is more likely than

not that one or more of the above grounds for appeal is satisfied, generally, the matter will be remanded for further investigation and/or adjudication by the Title IX Hearing Panel/Adjudicators, and/or an additional live hearing, as determined by the Appeal Official. If the Appeal Official grants an appeal finding the imposed sanctions or other response by the University are not appropriate to the finding, the Appeal Official has the discretion to modify the sanctions determination or to remand the matter to the Title IX Hearing Panel/adjudicators for a new sanctions determination. If the Appeal Official modifies the sanctions determination, the Appeal Official's sanction decision will be subject to an appeal pursuant to this Section.

When the matter is remanded, the Appeal Official, in consultation with the Title IX Coordinator, will determine whether the matter should be remanded to the original Adjudicators or whether new Adjudicators should be assigned. The Appeal Official may not change the Adjudicators' determination of whether the respondent was responsible or not responsible for a Policy violation. Only the Title IX Hearing Panel/Adjudicators reviewing the matter on remand from an appeal may change the determination of the original Title IX Hearing Panel/Adjudicators of whether the respondent was responsible or not responsible for a Policy violation. If the reasons for remand relate to the investigation or warrant additional investigation, the Appeal Official, in consultation with the Title IX Coordinator, will determine whether the matter should be remanded to the previous Investigator or whether a new Investigator should be appointed. Upon remand, the Investigator and Title IX Hearing Panel/Adjudicators will use the same process as required for all complaint resolution processes under this Policy. If the matter is remanded, the Title IX Hearing Panel's/Adjudicators' decision on remand will be appealable under the procedures discussed in this Section.

If the Appeal Official determines that there is insufficient evidence to determine that it is more likely than not that one or more grounds for appeal have been satisfied, the Appeal Official will dismiss the appeal. This dismissal decision is final and is not appealable. If the Appeal Official dismisses the appeal, the sanctions will be effective on the date the Appeal Official's decision is provided to the parties.

The Appeal Official will simultaneously issue a written decision to the parties describing the result of the appeal and the Appeal Official's rationale for the result. The time frame for the appeal generally is within twenty (20) calendar days from the Appeal Official's receipt of the appeal file. In some cases, more time may be required.

Appeals arising out of alleged violations of this policy must be made under this appeal process and are not eligible for consideration under faculty, staff or student grievance policies or processes.

## VI.    No Retaliation

Retaliation and Interference with Process is any act of intimidation, threat, coercion, or discrimination or any other adverse action or threat thereof against any individual for the purpose of interfering with any right or privilege secured by Title IX, its regulations, or this Policy or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this Policy. Encouraging or assisting others to engage in retaliation or to interfere with the process are also

considered Retaliation/Interference with Process and violate this Policy. While the University does not prohibit the parties from discussing the allegations in a formal complaint, acts that could constitute Retaliation and Interference with Process may include, but are not limited to: acts or comments that are intended to discourage a person from engaging in activity protected under this Policy or that would discourage a reasonable person from engaging in activity protected under this Policy; acts or comments that are intended to influence whether someone participates in the complaint resolution process, including the live hearing; acts or comments intended to embarrass the individual; adverse changes in employment status or opportunities; adverse academic action; and adverse changes to academic, educational, and extra-curricular opportunities. Retaliation and Interference with Process may be in person, through social media, email, text, and other forms of communication, and it may be committed by parties to the complaint resolution process, their friends or representatives, or any other person. Retaliation or interference with process may be present regardless of the outcome of the Sexual Misconduct complaint resolution process .

Any individual who is aware of conduct constituting Retaliation and Interference with Process should immediately contact the Title IX Coordinator. The University will take appropriate action against any individual who engages in Retaliation and Interference with Process in violation of this Policy, up to and including termination of employment or expulsion from the University. For more information, see section X. Complaints of Related Misconduct below.

Sincerely,

Robin Maynard
Sherry Chance
Mark Moland

Title IX Hearing Panel/Sexual Misconduct Panel

ATTACHMENT A

Updated January 19, 2022

In connection with a formal complaint of alleged Sexual Misconduct, LeTourneau University has issued this Mutual No Contact Directive. As part of the Mutual No Contact Directive, the parties must adhere to the following mandatory expectations. This Mutual No Contact Directive is being issued as a temporary interim measure while the Institution determines an appropriate response to the formal complaint. LeTourneau University reserved the right to amend this Mutual No Contact Directive as it deems appropriate.

- ████████ and ██████ are to have no direct or indirect contact by any means. This means that █████ and ██ may not directly contact each other or contact each other through a third party. This restriction on contact includes in-person, verbal, written, oral, physical, email, phone, text message, all types of electronic contact (including social media), and non-verbal contact (including eye contact, gestures, and staring), as well as contact initiated by others on █████'s or ████'s behalf.

- ████ is prohibited from being present in █████'s living area and ██████ is prohibited from being present in █████'s living area. ██████ may not be within 25 feet of ██████████ or ██████████ and ████ may not be within 50 feet of the ██████████████ █.

- Should either party need to communicate with or transfer items between the parties, this should only be done through the Title IX Coordinator, Kristy Morgan. Please contact her to facilitate this and do not attempt to communicate through friends or other parties.

- In all public spaces, including but not limited to the libraries, dining areas, study areas, and other common LeTourneau spaces, ██████ and ██ must make all reasonable efforts to remain at least 25 feet from each other and shall not have verbal or non-verbal contact. In classrooms, hallways, sidewalks, and other small venues where it is not possible to maintain the 25-foot separation, ████ and ██ will remain as far from each other as possible, avoid eye contact, and shall not have any verbal or non-verbal contact. In addition, please note that this extends to off-campus spaces such as off-campus housing, coffee shops, etc. If you do encounter each other in these off-campus public settings, the expectation is that you will comply with the requirements of this Mutual No Contact Directive. As a general rule, in regard to public spaces, the person who arrives second is responsible for either (1) leaving the space or (2) placing himself or herself at a distance from the other person that allows each person to use the space without contact. This applies to spaces both on-campus and off-campus. We expect each party to utilize good judgment when in public spaces and when making the determination about whether there is enough space to put necessary distance between the parties.

This Mutual No Contact Directive is effective immediately and will remain in place until further notice. Any violation of these expectations may result in disciplinary action, up to and including termination of student status and a permanent ban from the LeTourneau University campus and events.

To the extent questions arise regarding implementation of this Mutual No Contact Directive,
those matters will be resolved at the discretion of the Title IX Coordinator and such decisions
will not be appealable.

If you have any questions, please contact your Title IX Coordinator. If you have any concerns
about a violation of this Mutual No Contact Directive, please contact your Title IX Coordinator
or the University Police Department.

cc:     Michael Schultz, Chief of University Police