UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| JANE DOE, a North Dakota resident, | § § § § | |
| Plaintiff, | | |
| v. | § § § | CIVIL ACTION NO. 2:25-cv-00590-JRG-RSP |
| LeTOURNEAU UNIVERSITY, a Texas resident and BENJAMIN MURPHY, a Texas resident | § § § § | |
| Defendants. | § § § § § | JURY DEMAND |

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO LETOURNEAU UNIVERSITY'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

---

NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

STATEMENT OF ISSUES ..................................................................................................... 2

LEGAL STANDARD............................................................................................................ 6

ARGUMENT......................................................................................................................... 8

    I.    PLAINTIFF STATES A VIABLE CLAIM FOR PROMISSORY ESTOPPEL................ 8

    II.   PLAINTIFF STATES A VIABLE CLAIM FOR FRAUD ............................................ 13

CONCLUSION..................................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Ashley,*
  60 F.4th 262 (5th Cir. 2023) ........................................................................... 7, 13

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S. Ct. 1937 (2009)..................................................... 1, 6, 7, 15

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................................... 7

*Cicalese v. Univ. of Texas Med. Branch,*
  924 F.3d 762 (5th Cir. 2019) ......................................................................... 7

*Davis v. Texas Farm Bureau Ins.,*
  470 S.W.3d 97 (Tex. App. 2015)..................................................................... 8

*Drs. Hosp. 1997, L.P. v. Sambuca Houston, L.P.,*
  154 S.W.3d 634 (Tex. App. 2004)................................................................... 8

*English v. Fischer,*
  660 S.W.2d 521 (1983).............................................................................. 11

*Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,*
  51 S.W.3d 573 (2001)................................................................................ 13

*Frost Crushed Stone Co. v. Odell Geer Const. Co.,*
  110 S.W.3d 41 (Tex. App. 2002)..................................................................... 8

*In re Katrina Canal Breaches Litig.,*
  495 F.3d 191 (5th Cir. 2007) ......................................................................... 6

*Iraan-Sheffield Ind. School Dist. V. Kinder Morgan Prod. Co., LLC,*
  657 S.W.3d 525 (Tex. App. 2022)................................................................. 13

*Miller v. Raytheon Aircraft Co.,*
  229 S.W.3d 358 (Tex.App.—Houston [1st Dist.] 2007, no pet.) ............................ 8

*Morgan v. Box,*
  449 S.W.2d 499, 504 (Tex.Civ.App.—Dallas 1969, no writ) .............................. 14

*Morgan v. Swanson,*
  659 F.3d 359 (5th Cir. 2011) ......................................................................... 7

*Papasan v. Allain,*
  478 U.S. 265, 106 S.Ct. 2932 (1986)............................................................... 6

*Raj v. La. State Univ.,*
  714 F.3d 322 (5th Cir. 2013) ......................................................................... 7

*Samson Lone Star Limited Partnership v. Hooks,*
  497 S.W.3d 1 (Tex. App. 2016)..................................................................... 14

*Superior Laminate & Supply, Inc. v. Formica Corp.,*
  93 S.W.3d 445 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) ........................ 8

*Zenor v. El Paso Healthcare Sys., Ltd.,*
  176 F.3d 847 (5th Cir. 1999) ......................................................................... 8

**Rules**

Fed. R. Civ. P. 8(a)(2)...................................................................................... 6
Fed. R. Civ. P. 12(b)(6) ................................................................................. 6, 7

Plaintiff Jane Doe, by her attorneys Hossley & Embry, LLP and Nesenoff & Miltenberg, LLP hereby submits the following memorandum of law in opposition to Defendant LeTourneau University's ("LETU" or the "University") August 29, 2025 Motion to Dismiss Plaintiff's First Amended Complaint.

Plaintiff concedes her breach contract claim can be dismissed. However, the Court must deny the remainder of LETU's motion as Plaintiff viably states claims for promissory estoppel and fraud. Even if LETU's promises in its Sex Assault Policy and Student Handbook are non-contractual, Plaintiff relied on LETU to honor these same promises, which are designed to protect students, in deciding to remain enrolled at the University. These included the University's promises that it would "promptly and equitably respond to formal [Title IX] complaints in accordance with [its] provisions and procedures", and that it would "provide a fair and impartial complaint resolution process." Through its gender biased and Title IX investigation and prejudged outcome, Plaintiff's assailant, Defendant Ben Murphy, suffered zero consequences for repeatedly date raping Plaintiff. And due to LETU's litany of policy violations described in the Amended Complaint, Plaintiff has suffered financial harm, emotional distress, and deep mental anguish.

Contrary to LETU's arguments, the Amended Complaint amounts to far more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009). LETU wants this Court to hold Plaintiff to an elevated pleading standard, one of 'particularity' and 'probability', as opposed to 'plausibility', demanding factual details that Plaintiff cannot access without discovery.

## STATEMENT OF ISSUES

1.      Whether Jane Doe's breach of contract claims should be dismissed because she fails to plausibly allege an enforceable contract, a breach of a specific contractual provision, or that any alleged breach caused her harm.

RESPONSE:   Plaintiff agrees to voluntarily dismiss her breach of contact claim; thus, this issue need not be considered on this motion.

2.      Whether Jane Doe's promissory estoppel claims should be dismissed because she fails to plausibly allege a definite promise and detrimental reliance.

RESPONSE:   Plaintiff agrees that one issue on this motion is whether she has plausibly alleged the elements of promissory estoppel, including definite promise and detrimental reliance.

3.      Whether Jane Doe's fraud claim should be dismissed because she fails to plausibly allege LeTourneau made misrepresentations with knowledge of falsity or that she was injured based on relying on LeTourneau's representations.

 RESPONSE:   Plaintiff agrees that one issue on this motion is whether she has plausibly alleged the elements of a fraud claim, including knowledge of falsity and consequent injury.

## BACKGROUND

LETU fairly describes the factual background of this case. ECF No. 13 pp. 3–7 of 31. Specifically, this case arises out of Defendant Murphy's 2021 repeated date rape of Plaintiff while both were students at LETU, along with the University's bad faith, corrupt, and gender-biased Title IX process. *See*, ECF No. 11 ¶¶ 1–3. This led to a rigged Title IX hearing, in which LETU acquitted Defendant Murphy despite the greater weight of evidence pointing toward his guilt.

Plaintiff, who left home to attend LETU, graduated in 2022 with a degree in biomedical engineering. *Id*. ¶5. She was drawn to LETU, over other schools, by its expressed staunch embrace of Christian values and principles. *See, id.*

According to its Handbook, LETU holds itself out as "a comprehensive institution of Christian higher education where educators engage learners to nurture Christian virtue, to develop competency and ingenuity in their professional fields, to integrate faith and work, and to serve the local and global community." The University claims that Christ "guides every aspect of our lives." *Id*. ¶7.

LETU's Handbook promises that it "does not discriminate on the basis of . . . sex in the administration of any of its educational programs, admissions policies, scholarship and loan programs, athletic and other school-administered programs." *Id*. ¶10.

Murphy's sexual transgressions violated several LETU policies, including those prohibiting the sexual violence, physical abuse and the possession of illicit drugs. *See, id*. ¶¶49–54.

However, due to the University's neglectful investigation and anti-female bias, Murphy was neither expelled nor disciplined for these actions. LETU's malfeasance is embodied in its manipulation of a faculty jury member to vote to acquit Murphy. *See, id*. ¶4.

This outcome contradicted several LETU policies and representations. Crucially, on its webpage LETU expressly represented to students that:

- In compliance with federal and state laws, it is policy of LeTourneau University to prohibit unlawful harassment and sexual misconduct by any person and in any form. *Id*. ¶61

- "LeTourneau University will investigate all complaints of harassment or sexual misconduct, formal or informal, verbal or written, *and take appropriate action or discipline* against any person who is found to have violated this policy." *Id*. ¶62. (Emphasis added.)

LETU's Sexual Assault/Title IX policy further promised:

- "The University will not tolerate Sexual Misconduct in any form. The University will *promptly and equitably respond* to all reports of Sexual Misconduct in order to take steps to eliminate the misconduct, prevent its recurrence, and address its effects on any individual and the community." *Id*. ¶63(c) (Emphasis added.)

- "When the University receives a formal complaint of a potential Policy violation, the University will promptly and equitably respond to the formal complaint in accordance with the provisions and procedures set forth below. The University will *provide a fair and impartial complaint resolution process*. A fair process is one that treats the parties equitably, provides complainant an opportunity to file a formal complaint alleging a violation of this Policy and an opportunity to present evidence of the allegations prior to a decision on responsibility. . . and provides both parties an opportunity to challenge the credibility of the other party and any witnesses prior to a decision on responsibility." *Id*. ¶64(p) (Emphasis added.)

- "Each Sexual Misconduct complaint resolution process will be conducted by individuals, including Title IX Coordinators, Investigators, Title IX Hearing Panel members/Adjudicators and any person who facilitates an informal resolution process, who do not have a conflict of interest or bias for or against complainants or respondents generally or for or against the individual complainant or respondent." *Id*. (q).

On June 1, 2022, approximately seven months after Plaintiff filed her complaint, LETU finally held the Title IX hearing. By this time, both Plaintiff and Murphy had graduated. *Id*. ¶87. LETU endeavored to drag the Title IX investigation out long as possible, ensuring Murphy was allowed to graduate before the hearing. *Id*. ¶91. Upon information and belief, had Murphy been found responsible prior to graduating, he would not have received his LETU degree. *Id*. ¶93.

On June 30, 2022, the LETU Title IX office issued its written determination, finding Murphy 'not responsible' for violating any LETU policy regarding hostile environment/harassment. *Id.* ¶96. LETU found Murphy credible despite Murphy making a crucial Freudian slip during the hearing, saying "When [Plaintiff] realized I was drugging her . . . I mean, thought . . ." *Id.* ¶98. This was Murphy essentially, <u>admitting</u> to drugging Plaintiff. This was also despite Murphy falsely saying he had stopped

4

using drugs and alcohol – an earlier police search of his apartment had found drug paraphernalia. *See*, *id.* ¶¶ 48, 99.

Specifically, LETU found that "there is insufficient evidence to determine that it is more likely than not that [Murphy] engaged in Sexual Assault, Title IX Sexual Harassment, Non-Title IX Sexual Harassment, Domestic Violence, and/or Dating Violence." And "accordingly, the Panel finds that there is insufficient evidence that a Policy violation by [Murphy] occurred." *Id*. ¶97.

The hearing "jury" was made up of faculty members, at least one of whom later told Plaintiff that he was pressured into voting "not responsible." *Id*. ¶100.

From the first time Plaintiff set foot on campus as a LETU student – at her freshman orientation –Plaintiff was aware of LETU's Sexual Assault/Title IX Policy, and the promises it made. *See*, *id*. ¶56.

Rather than withdrawing or transferring elsewhere, Plaintiff remained at LETU paying room and board plus incidentals, year after year. She did so, in part, in reliance on the University's promises in its Sex Assault/Title IX Policy. *Id*. ¶136. Had Plaintiff known that, should she be sexually assaulted on LETU's campus, LETU would not treat her fairly and equitably and would instead be biased in favor of her male assailant, she would not have stayed at LETU. Had she known how LETU would handle her assault, Plaintiff would have transferred to an institution closer to her family home. *Id*. ¶137.

Plaintiff suffered intense physical, psychological, and emotional damage from Defendants' favoritism toward Murphy and indifference to her rape. Due to Murphy's abuse, Plaintiff was diagnosed with PTSD and received medications for severe depression and anxiety. She also suffered from suicidal thoughts in the wake of the rape and LETU's nonchalant response to it. *See*, *id*. ¶¶68–74. However, she continued praying and began therapy to help cope with the pain. *Id*. ¶117.

5

After graduating from LETU in the wake of the Title IX outcome, Plaintiff suffered a breakdown in her physical and mental health. This included panic attacks, severe weight loss, loss of appetite, digestive issues, and manic-depressive episodes. *Id.* ¶115.

LETU's mishandling of her case shattered Plaintiff's Christian faith and her broader worldview. LETU treated Plaintiff like a liar and a whore, effectively blaming her for what Murphy did. This left Plaintiff despondent and caused her severe mental anguish even more traumatic than what Murphy inflicted. *Id.* ¶116.

Since graduating, Plaintiff has undergone, and continues to undergo, therapy and counseling to grapple with the trauma Defendants caused. For the past year and a half, she has been engaging in weekly intensive Eye Movement Desensitization and Reprocessing ("EMDR") therapy to deal with her PTSD. *Id.* ¶117.

## LEGAL STANDARD

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009), citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932 (1986). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (cleaned up). Overall, Rule 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.*

Under Rule 12(b)(6), the Court reviews the complaint and accepts well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*,

6

495 F.3d 191, 205 (5th Cir. 2007). To pass muster, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, a plaintiff "need not make out a prima facie case" in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim*." Cicalese v. Univ. of Texas Med. Branch,* 924 F.3d 762, 766 (5th Cir. 2019), citing *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief." *Id*. (citations omitted).

Courts do not "presume true a number of categories of statements, including legal conclusions; mere labels threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).

## ARGUMENT

### I.   PLAINTIFF STATES A VIABLE CLAIM FOR PROMISSORY ESTOPPEL

The University argues "Jane Doe's promissory estoppel claims fail as a matter of law because she does not plausibly allege that LeTourneau made a definite and specific promise upon which it was reasonable for her to rely." ECF No. 13 p. 21 of 31. Also, "she further fails to present sufficient facts detailing how she was harmed through her reliance." *Id*.

The elements of promissory estoppel are: "(1) a promise; (2) foreseeability of reliance thereon by the promisor; and (3) substantial reliance by the promisee to his detriment". *Davis v. Texas Farm Bureau Ins*., 470 S.W.3d 97, 107 (Tex. App. 2015), citing *Miller v. Raytheon Aircraft Co.,* 229 S.W.3d 358, 378–79 (Tex.App.—Houston [1st Dist.] 2007, no pet.)  "Reliance on the promise must be reasonable and justified." *Frost Crushed Stone Co. v. Odell Geer Const. Co*., 110 S.W.3d 41, 45 (Tex. App. 2002).

A "promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee [or a third party] and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Zenor v. El Paso Healthcare Sys., Ltd*., 176 F.3d 847, 864 (5th Cir. 1999)*,* quoting *Restatement (Second) of Contracts,* § 90.

"Promissory estoppel becomes available to a claimant only in the *absence* of a valid and enforceable contract." *Drs. Hosp. 1997, L.P. v. Sambuca Houston, L.P*., 154 S.W.3d 634, 636 (Tex. App. 2004). "Promissory estoppel operates to enforce an otherwise unenforceable promise." *Id*., quoting *Superior Laminate & Supply, Inc. v. Formica Corp.,* 93 S.W.3d 445, 449 (Tex.App.-Houston [14th Dist.] 2002, pet. denied).

8

As detailed above and in the Amended Complaint, LETU, via its Handbook and Sex Assault Policy, made specific safety-related promises that Plaintiff detrimentally relied upon. *See*, p. 4 supra, and ECF No. 13 ¶¶131–135. Specifically:

- That "sexual harassment or sexual misconduct, in any form . . . will not be tolerated at LeTourneau."

- That "In compliance with federal and state laws, it is the policy of LeTourneau University to prohibit unlawful discrimination or harassment, including Sexual Misconduct, in any form." Under the Policy, "Sexual Misconduct" includes sexual assault and dating violence

- That "LeTourneau University will investigate all complaints of harassment or sexual misconduct, formal or informal, verbal or written, and take appropriate action or discipline against any person who is found to have violated this policy."

- That "The University will not tolerate Sexual Misconduct in any form [and] will promptly and equitably respond to all reports of Sexual Misconduct in order to take steps to eliminate the misconduct, prevent its recurrence and address its effects on any individual and the community."

- That "When the University receives a formal complaint of a potential Policy violation, the University will *promptly and equitably respond* to the formal complaint" and "will provide a *fair and impartial* complaint resolution process. A fair process is one that treats the parties equitably . . ."

By manipulating the Title IX process to acquit Murphy in the face of sufficient evidence, LETU showed that it, indeed, "tolerated" sexual assault. By showing clear bias in favor of the male respondent, the University discriminated against Plaintiff because of her sex. By acquitting Murphy despite his tacit admission of guilt and wounded credibility, the University failed to "take appropriate action or discipline" against a violator. And by manipulating the faculty juror panel, the University failed to provide a "fair and impartial complaint process."

9

According to the University, however, its statements that it "prohibit[s] unlawful discrimination or harassment, including Sexual Misconduct" and that "sexual misconduct, in any form will not be tolerated", are mere poetic aspirations of hope, rather than specific commitments. *See*, ECF No. 13 p. 21 of 31, citing ECF No. 11 ¶¶131–132. If such were the case, the Policy language would likely include qualifiers such as 'LeTourneu strives to" or "works towards". Instead, the University used unambiguous, imperative language: "will not be tolerated", "prohibited", and "in any form." Plaintiff does not argue that LeTourneu ever promised that she, or students generally, would never be sexually assaulted on campus. Regrettably, that is not a realistic thing for anyone to promise. LeTourneau did, however, make promises as to how it would respond to and adjudicate instances of sexual assault. *See*, *e.g.*, ECF 11 ¶¶133–135. It failed to keep those promises.

The Amended Complaint also details Plaintiff's *reliance* on the above promises and the harm she suffered as a result.

To begin with, the LETU Handbook and Policy are designed to induce reliance on the part of current and prospective students, along with their families. LETU is an accredited institution of higher learning that receives and relies upon federal funding. *Id.* ¶146. As such, LETU needs to comply with federal law, including Title IX, to preserve this funding. *Id.* ¶147. Surely, LETU crafted its Sexual Assault/Title IX policy, at least in part, to comply with federal law. *Id.* ¶148. But it likely also did so to evoke a sense of safety and security in its current and future student body. Absent such a policy, students (and their parents) would likely have misgivings about campus safety, possibly deterring their enrollment or prompting transfers. *Id.* ¶149.

If such was the University's intent behind these promises, it worked on Plaintiff. "Rather than withdrawing or transferring elsewhere, Plaintiff enrolled and remained at LETU, paying room and board plus incidentals, year after year in reliance on the University honoring its Sex

10

Assault/Title IX Policies." *Id*. ¶137. "Had Plaintiff known that, should she be sexually assaulted

on LETU's campus, LETU would not treat her fairly and equitably and would, instead, be biased

in favor of her male assailant, she would not have stayed at LETU." *Id*. ¶138. Plaintiff would have

transferred to a secular institution closer to her family home." *Id*. Put simply, Plaintiff never would

have enrolled, or remained enrolled, at the University had she known that LETU would be biased

in favor of male violators.

The University is correct that "To show detrimental reliance, the plaintiff must demonstrate

that she materially changed her position in reliance on the defendant's promise." ECF No. 13 p.23

of 31 (emphasis addended), citing *English v. Fischer*, 660 S.W.2d 521, 524 (1983) (finding no

promissory estoppel as "everything done by Fischer would necessarily have been done whether

the check was endorsed or not.") The *English* case is distinguishable as Plaintiff indeed changed

her position in reliance. As a young female, she would never have remained at LETU knowing

that, should she be sexually assaulted, the University would not honor its Title IX commitments

and would work to ensure that her rapist avoided consequences. Or that she would be 'slut shamed'

and not believed, and that the scales would be tipped in favor of the accused. No sane female

student would.

LETU next argues that Plaintiff "provides no factual detail that would allow the Court to

plausibly infer that the promises made in LeTourneau's Policy were the deciding factors in her

choices to enroll in LeTourneau and to continue her education at the institution." ECF No. 13 p.

23 of 31. However, apart from asserting as much in the Amended Complaint (*see*, ECF no. 11

¶137), there is little else Plaintiff can do at this stage. The Court should have every confidence that

her eventual testimony will be consistent with her pleadings.

11

The University's next point is that Plaintiff "admits that she was not aware of the Policy or any related promises until after she applied and was accepted to LeTourneau." ECF No. 13 p. 23 of 31, citing ECF No. 11 ¶56 (Plaintiff first learned of LeTourneau's Policy for the first time at freshman orientation). And that "This allegation negates any plausible inference that Jane Doe relied on the Policy when deciding to attend LeTourneau." Indeed, Plaintiff was not aware of the Policy and its promises before enrolling as a freshman. However, this ignores her *continuing* decisions to remain at LETU after learning of the Policy, as opposed to withdrawing or transferring. Plaintiff remained enrolled at LETU, semester after semester, in part because she trusted the University would treat her fairly and equitably in the unfortunate event that she suffered a Title IX violation, and that LETU would be fair and impartial in any adjudication of the same.

The University claims Plaintiff's "admission that LeTourneau's Policy did not play any role in her initial decision to apply makes it unreasonable to assume that the absence of the policy during a subsequent school year would play a role in her decision to remain at LeTourneau." ECF No. 13 p. 24 of 31. LETU assumes the discovery that the University would not treat her fairly and equitably in the event of *repeated* assault would have *no impact* on a young woman's decision on where to attend college. That defies belief. Equally confusing is its remark that Plaintiff "does not allege that she only applied to or considered transferring to schools that made similar Title IX-related promises." *Id*. Since Plaintiff only learned of LETU's duplicity well into her senior year, (and in the case of the Title IX hearing, after graduation) there was no occasion for her to ponder transferring.

According to LETU "Plaintiff appears to expect the Court to take her solely at her word . . . that she would not have applied to LeTourneau if the University did not assure its students that it does not tolerate sexual misconduct, and that she would have withdrawn prior to her senior year if

12

that year's version of the Handbook or policies failed to include the assurances." *Id*. p. 25 of 31.

LETU misrepresents the analysis: the question is not what Plaintiff would have done with or

without certain assurances – LETU unquestionably made assurances; the question is what Plaintiff

would have done had she known all along that its assurances were meaningless.  And yes, Plaintiff

asks the Court to take her at her word as to factual assertions regarding her own state of mind and

decision-making. *See*, *Armstrong v. Ashley,* 60 F.4th 262, 269 (5th Cir. 2023) ("the court accepts

all well-pled facts as true, drawing all reasonable inferences in favor of the nonmoving party.")

## II.     PLAINTIFF STATES A VIABLE CLAIM FOR FRAUD

The University "expressly, or at the very least implicitly, through its Handbook and

Policies, represented to its students that it would apply those policies honestly, fairly, accurately,

and evenly – without bias based on gender. ECF No. 11 ¶141. As Plaintiff's experience

demonstrates, LETU failed to live up to many promises. And when it came to holding male

students responsible for their sexual misdeeds, it never intended to. *See*, *id.* ¶151–153.

The elements of actual fraud are "1) that a material misrepresentation was made; 2) the

representation was false; 3) when the representation was made, the speaker knew it was false or

made it recklessly without any knowledge of the truth; 4) the speaker made the representation with

the intent that the other party should act upon it; (5) the party acted in reliance on the

representation; and (6) the party thereby suffered injury." *Iraan-Sheffield Ind. School Dist. V.*

*Kinder Morgan Prod. Co., LLC*, 657 S.W.3d 525, 535 (Tex. App. 2022).

"A claim for actual fraud therefore involves dishonesty of purpose or intent to deceive."

*Id.* "A fraud cause of action exists if the false representations be made with a view of reaching the

third person to whom it is repeated, and for the purpose of influencing him." *Ernst & Young*, L.L.P.

*v. Pacific Mut. Life Ins. Co*., 51 S.W.3d 573, 578 (2001). "A defendant who acts with knowledge

13

that a result will follows is considered to intend the result." *Samson Lone Star Limited Partnership v. Hooks*, 497 S.W.3d 1, 15 (Tex. App. 2016). "Before a promise to do something in the future can be actionable fraud, plaintiff must additionally plead and prove that at the very time such promise was made, the promissor did not intend to carry it out." *Morgan v. Box*, 449 S.W.2d 499, 504 (Tex.Civ.App.—Dallas 1969, no writ).

Plaintiff has alleged that LETU's intended for Plaintiff, and students generally, to rely on these representations. As discussed above, LETU drafted and issued its Policy motivated, at least in part, to engender a sense of safety and confidence in its students. *See*, p.10, supra, ECF No. 11 ¶149.

LETU, however, argues Plaintiff's "allegations of bias are conclusory and not supported by sufficient factual allegations." ECF No. 13 p.27 of 31. And that "Jane Doe also appears to rely on an argument about the general prevalence of patriarchal ideals within society to show that LeTourneau never intended to apply its Title IX Policies evenly across genders." *Id.* p.28 of 31, citing ECF No. 11, ¶ 151. "This broad and speculative contention does not speak at all to LeTourneau's specific mindset at the time it enacted its policies." *Id.* However, without the benefit of discovery, Plaintiff is not able to explore, in greater detail, LETU's subjective intents, motivations, biases, and sincerity regarding these representations – either at the time it issued its Sex Assault Policy or afterwords. And without discovery, she is not able to examine the pressured faculty juror to get every detail of what occurred.

LETU's final argument mirrors that raised as to the promissory estoppel claim, namely that Plaintiff has not alleged detrimental reliance on the University's representations. "Jane Doe provides no factual detail allowing the Court to make the reasonable inference that she in fact would not have applied to LeTourneau or returned year after year if the Policy did not state that

the University followed Title IX legal requirements." ECF No. 13 p.30 of 31. "Jane Doe admits in her Amended Complaint that she was not aware of LeTourneau's Policy until after she applied to LeTourneau." ECF No. 11, ¶ 56. Accordingly, "Jane Doe could not have relied on any alleged misrepresentation within the Policy or Handbook when deciding to enroll there." *Id.* This argument fails for the same reason it does as to estoppel: it misconstrues and misrepresents the argument. Specifically, it neglects to address Plaintiff's reliance in remaining at LETU, year after year, on the assumption that the University would uphold its promises.

Overall, while Rule 8 demands mere plausibility, LETU demands *particularity* and *probability*. Plaintiff has supplied as much detail as she possesses without the aid of discovery. She has pointed to LETU's specific representations and has, to the best of her knowledge, explained how the University failed to abide by them. Specifically, she has alleged how LETU acquitted Murphy despite his tacit confession to drugging her and despite being caught lying about his drug use. She further alleged that the University applied *at least some* pressure on a faculty juror to get them to vote for acquittal. This is "more than a sheer possibility that a defendant has acted unlawfully" and is sufficient to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plaintiff should not be punished for her want of omniscience.

## CONCLUSION

Plaintiff voluntarily dismisses her breach of contract claim. However, the Court should deny the remainder of LETU's motion as Plaintiff has stated viable claims for promissory estoppel and actual fraud.

15

**Dated this 1ˢᵗ day of October, 2025**

Respectfully submitted,

*/s/ Jeffrey T. Embry*
Jeffrey T. Embry
State Bar No. 24002052
jeff@hossleyembry.com
Attorney-In-Charge
Matt Montgomery
State Bar No. 24041509
matt@hossleyembry.com
Margaret C. Pennell
State Bar No. 24116893
meg@hossleyembry.com
**HOSSLEY EMBRY, LLP**
515 S. Vine Ave.
Tyler, Texas 75702
Ph. 903-526-1772
*s/Rodman W. Streicher*
Rodman W. Streicher (Admitted *pro hoc vice*)
**NESENOFF & MILTENBERG, LLP**
363 Seventh Avenue, Fifth Floor
New York, New York 10001
T. (212) 736-4500
rstreicher@nmllplaw.com
***Attorneys for Plaintiff***

16